[Cite as *State v. Wright*, 2022-Ohio-1786.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY

STATE OF OHIO                          :
                                       :
        Plaintiff-Appellee             :    Appellate Case No. 2021-CA-17
                                       :
v.                                     :    Trial Court Case No. 2020-CR-87
                                       :
KEVIN C. WRIGHT                        :    (Criminal Appeal from
                                       :    Common Pleas Court)
        Defendant-Appellant            :
                                       :

. . . . . . . . . . .

O P I N I O N

Rendered on the 27th day of May, 2022.

. . . . . . . . . . .

ANTHONY E. KENDELL, Atty. Reg. No. 0067242, Prosecuting Attorney, Miami County
Prosecutor's Office, Safety Building, 201 West Main Street, 2nd Floor, Troy, Ohio 45373
        Attorney for Plaintiff-Appellee

STEPHEN E. PALMER, Atty. Reg. No. 0065265, 511 South High Street, Columbus, Ohio
43215
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Kevin C. Wright appeals from his conviction, following a jury trial, on three counts of rape, in violation of R.C. 2907.02(A)(1)(b) (child under 13), felonies of the first degree. The court sentenced Wright to a mandatory term of 10 years to life on each count, to be served consecutively, for an aggregate term of 30 years to life. The court also designated Wright a Tier III Sex Offender. We will affirm the judgment of the trial court.

{¶ 2} Wright was indicted on February 7, 2020, on three counts of rape involving the same victim, K.W., who is a relative of Wright. Each count was alleged to have occurred during a separate period of time or on a specified date: the first count alleged that Wright engaged in sexual conduct with K.W. between August 1, 2017, and June 1, 2018; the second count alleged sexual conduct between August 1, 2018, and June 1, 2019; and the third count alleged sexual conduct on December 8, 2019. Wright pled not guilty. The trial began on April 26, 2021.

{¶ 3} Sergeant Timothy Cline of the Covington Police Department testified that he supervises patrol officers and the school resource officer. Cline stated that on December 10, 2019, he was working as a school resource officer himself when the high school principal called his cell phone directly. Cline testified, without objection, that the principal had stated that a junior high student was reporting that she had been sexually abused by Wright, and the principal asked Cline to respond to the school. Cline headed to the school and sent the Chief of Police a text message about the allegations, because Wright had previously worked at the Covington Police Department, and Cline "felt that it could

be a conflict of interest" for that department to investigate. Cline testified that the chief of police contacted the Sheriff to request that the Sheriff's Office take over the investigation, and the Sheriff agreed to do so.

{¶ 4} Cline responded to the school and spoke with Josh Meyer, the junior high principal, and one of K.W.'s teachers, Kayla McEldowney. While at the school, Cline received a call about an "unruly juvenile" in the parking lot who was "not listening and screaming and yelling at her mother." Cline stated that he observed K.W. and her mother ("Mother") standing beside Mother's vehicle; Mother appeared to be angry, and K.W. was crying. Cline stated that he offered to transport K.W. to the Sheriff's Office; he got in his patrol vehicle and had K.W. sit in the passenger seat. Cline drove K.W. to the Safety Building; she "was crying and pretty quiet." At the Safety Building, Cline met with Carmen Barhorst from "victim witness" and Detective Cooper from the Sheriff's Office.

{¶ 5} On cross-examination, Cline stated that he was familiar with K.W. from being the School Resource Officer from the 2015-16 school year to the middle of the 2019-20 school year. Cline stated that K.W. had once claimed to have been a victim of bullying (along with some of her classmates), and in response, he and the junior high guidance counselor did some presentations about bullying as part of the DARE program. Cline stated that Wright had worked with him in resolving the situation and had supported K.W. Cline testified that text messages subsequently revealed that K.W. had been the aggressor in the bullying situation and that she had not been truthful with him during his investigation. Cline stated that he had had more than one interaction with K.W. at school regarding disciplinary issues. He stated that K.W. knew that he investigated crimes as

part of his duties. He also stated that Mother had called dispatch to request assistance transporting K.W. to the Sheriff's Office. On redirect examination, Cline stated that bullying in junior high is common among girls, and that he did not conduct the bullying programs just because of K.W.

{¶ 6} K.W. testified that she was 13-years-old at the time of trial and in eighth grade. K.W. stated that she was involved in track, volleyball, and basketball, and that her grades were all As. K.W. testified that, on December 10, 2019, she met Detective Cooper at the Sheriff's Office. She stated that at the time, she lived on North Miami Street in West Milton with Mother, Wright, and her three younger siblings, brother T.W., sister A.W., and brother C.W. K.W. stated that she had been babysitting for her siblings since she was 10 years old.

{¶ 7} K.W. stated that two days before she met Det. Cooper, she was called to the office to talk to the principal and Ms. McEldowney, her math teacher, during the second-to-last period of the day. She stated that she was surprised that they wanted to talk to her about what was going on at her home. K.W. stated that she "didn't go into detail" with McEldowney, but had told her "that things were going on." She stated that the last time "something had happened" to her at home was on Sunday, December 8, 2019, and that Wright was the perpetrator. K.W. stated that, on that day, she had fed her siblings during the afternoon; then her siblings all went upstairs, and she went downstairs to her room to clean. While she was cleaning her room, Wright came in, asked what she was doing, and then asked if she "wanted to do it tonight." K.W. said she understood what this meant because it had "happened before," but the conversation made her "scared and

nervous" because she "knew it was going to happen." According to K.W., she first said "I don't know" and then "kept saying no," but Wright said "I'll see you tonight" to K.W. when Mother came in the room.

{¶ 8} K.W. stated that, at that time, Mother had worked at Premier Health as a patient care technician from 7:00 a.m. to 7:00 p.m. or 9:00 a.m. to 7:00 p.m. K.W. stated that Wright had been a West Milton police officer at the time, working 7:00 p.m. to 7:00 a.m. She testified that, on December 8, 2019, the family had lived in the home in West Milton for about a year. K.W. stated that her little sister, A.W., had initially slept in the bedroom with K.W. when they had moved in but moved upstairs about two months later; K.W. stated that A.W. had a bed in the playroom. With respect to her other siblings, K.W. testified that C.W. had been two years old at the time and that he slept in Mother and Wright's room, and T.W. had his own room upstairs.

{¶ 9} K.W. stated that on December 8, 2019, she went to bed around 9:30 p.m., and Wright got into her bed in the middle of the night; he put his phone beside her and showed her a video "of what he wanted to do," reflecting two people having sex. K.W. identified photos of her bedroom, including a laundry basket. She stated that she had been wearing a red Student Council T-shirt, pink shorts and orange underwear, and Wright had been wearing gray sweat pants and no shirt. K.W. testified that she was lying on her back, and Wright was on top of her, and her clothes were still on, but then Wright's pants "came off." She stated that Wright was naked and his whole body was top of her. K.W. stated that Wright "was like moving back and forth on top of me"; after five minutes Wright took her underwear off and "put his private part in [her] private part." According

to K.W., she "told him it hurt and he got off" of her, but he was "mad." K.W. stated that she said, "I'm done with it cause like it hurt," but Wright said "we'll see what happens tomorrow." K.W. identified her red shirt, pink shorts, and orange underwear, and Wright's sweatpants.

{¶ 10} According to K.W., after Wright left her room, she felt "[s]ick to [her] stomach" because "it hurt, so I didn't feel good that night." She went to school the next day and talked to her friend Mercedes at the end of basketball practice. K.W. asked Mercedes, in the form a question so as to not make it about herself, what is it when someone "does something to a girl that [she] doesn't want to happen to her," and then Mercedes "got concerned" about K.W. K.W. "didn't want it to happen anymore." She stated that the incident on December 8, 2019, was not an isolated one, and that Wright's abuse of her began when she was in the fifth grade. K.W. said that she did not disclose the abuse earlier because she was scared and Wright was "part of the law"; K.W. believed that if she disclosed the abuse, she would get into trouble, and "[n]othing would be fixed, it would just go back."

{¶ 11} K.W. stated that she spoke to McEldowney for a brief time at school before Mother arrived. Her other siblings were in the car, and Mother brought C.W. into the building with her, so although K.W. was trying to talk to Mother about what was happening, Mother yelled and was arguing with her and K.W. "could tell she was upset and mad." K.W. stated that, after she got into the car, Mother told her that she was scaring her siblings and told her to get out of the car. Mother called an officer to transport K.W. According to K.W., Mother did not believe that the abuse had occurred, and K.W.

told her that it had.

{¶ 12} K.W. stated that after she was interviewed by Det. Cooper, she was taken to the hospital to be examined, where she felt "scared and pressured." She went home from the hospital with her maternal grandparents, J.B. and G.B., who lived in Troy. The following day, K.W. met with Cooper, and she identified in photos the clothing that she had been wearing on December 8, 2019. K.W. testified that she had lived with her grandparents for a year after her disclosure, but her grandparents had since moved to Tennessee, and she lived at the home of her "best friend from fifth grade" at the time of trial.

{¶ 13} K.W. testified that she did not have any specific memories of Wright's abuse because "it happened so many times." She stated that Wright first touched her in a sexual way when she was ten years old, when he "was just touching under a blanket over my clothes." She stated that Wright had touched her vaginal area over her clothes, and that it happened in the living room when the family lived on North Pearl Street in Covington. In regard to what "kicked [the abuse] off," K.W. associated the beginning of the abuse with "the talk" about "body changes," which happened in school in the fifth grade; within a few days of a packet being sent home about the program, Wright started asking K.W. whether she had started her period, and she told him that she had not.

{¶ 14} According to K.W., the abuse progressed, and Wright started touching her underneath her clothes; she identified this as happening in the living room when she was still in fifth grade. It then further progressed to his "putting his fingers inside of [her]" "at the same place" and to oral sex, meaning that her "mouth [was] on his private part and

his mouth on [hers]." Wright and Mother were both working third shift at the time, but they worked on "opposite" days, so one was off when the other one worked. Wright first placed his penis in K.W.'s mouth at the "end of fifth grade in the summer"; as K.W. described the incident, Wright wanted her to put his penis in her mouth, so she was lying beside him doing that "for like five minutes," and "then it switched" and Wright put his mouth on K.W.'s "private area." Although K.W. stated that incidents of abuse sometimes ran together or got "mixed up" in her mind, she remembered the first incident of oral sex because it "happened to both of us, so it was me on him and him on me."

{¶ 15} K.W. testified that the abuse occurred every weekend that Wright was home from work. She stated that, in sixth grade, during the 2018-2019 school year, there was another incident that she more specifically recalled; "[t]his time it was still oral but just something else happened differently and it was in his room." She testified that this incident was different because Wright "came," a term she learned from him. As K.W. described it, it started similar to the other incident of oral sex about which she had testified, but Wright first wanted her "to rub his private part so it would get harder," and then he made her perform oral sex on him while he was lying on the bed and she was "kind of on top of him * * * in a horizontal type way." Then they "switched again," so that he was on the top and she was underneath, and he put his mouth on her private area. "While he was on me he was touching himself," and then "he flipped [her] over * * * really fast," such that she was on her stomach, "and he finished on my back." K.W. testified that Wright ejaculated on her back, then grabbed a towel from the bathroom and wiped off her back.

{¶ 16} K.W. further testified that Wright first showed her pornography "in the

Covington house" on the television in the living room. She stated that she had also watched pornography on her own "[a]fter it was brought to [her]" when she lived in West Milton. She stated that she got into trouble with Mother and Wright for doing so, but she did not tell Mother that she had watched pornography before with Wright because "he was right there * * * and she wasn't going to believe me."

{¶ 17} K.W. stated that Wright gave her a vibrator when she was 11 years old and lived on North Pearl Street, that he used it, and that he told K.W. to keep it hidden from her mom. She stated that she kept it in a box under her bed and that Wright was mad when she returned it to him and "took it very aggressively."

{¶ 18} K.W. acknowledged that she kept a diary and that she did not mention Wright in her writings; she recorded her goals in her diary. On page 17 she had written the following in bold letters: "tell the truth." With respect to the bullying incident at school, K.W. stated that she had deleted inculpatory text messages that she sent to another girl, and that her parents had learned of the messages from the other girl's phone. As a consequence, K.W.'s phone was taken away.

{¶ 19} K.W. testified that she had confided to her maternal grandmother that Wright was mean to her and T.W. and had told the grandmother that she (K.W.) wanted to live with her. She stated that her friend Mercedes was the first person she told about the sexual abuse, and then she told McEldowney. K.W. stated that Wright had had sex with her on November 30, 2019, and that she remembered the date because she had a basketball game that day. Besides November 30, 2019, and December 8, 2019, K.W. did not know specific dates and times that the abuse had occurred.

{¶ 20} On redirect examination, K.W. testified that on December 11, 2019, Mother told her that she (K.W.) "would lose a lot of things" if she told anyone about the abuse and encouraged her to change what she had said "in the beginning." According to K.W., Mother "talked about how thing[s] would be taken away and it wouldn't be a nice family anymore," told her that Wright would lose his job, and threatened to not buy her anything anymore. Although Mother had tried to insist on being present for the interviews, Mother was not allowed to attend. K.W. stated that she had been in counseling for five months after she disclosed the abuse. She stated that she had not tried to fight Wright off in the course of the incidents because "he had more strength" over her and she believed she would "get hurt even worse" than just letting him do it to her.

{¶ 21} K.W.'s friend Mercedes was 14 years old at the time of trial. Mercedes testified that she and K.W. were "good friends" and played basketball together in seventh grade during the 2019-2020 school year. According to Mercedes, in December 2019, she went to the principal of their school to report a conversation that she had had with K.W. in which K.W. asked Mercedes "what is it called if someone's dad is doing stuff to them that she doesn't want them to do." Mercedes responded that it was called "rape or something like that" and inquired why K.W was asking. K.W. claimed she was "asking for a friend," but Mercedes responded "don't lie to me," and K.W. then told her that Wright "was doing things to her." K.W. was crying, and Mercedes told her that they needed to tell someone. Mercedes stated that K.W. did not want to get in trouble or get anyone mad at her. Mercedes later told her mom and, when she went to school the next day, she told "Mr. Long" what K.W. had said. Mercedes did not tell K.W. that she had told

anyone.   The next day, Mercedes observed K.W. and Mother in the school office; K.W. "looked upset" and her mom looked "mad."   She also testified that when she went to the school office, unnamed school personnel told her that K.W. had been abused by Wright.

{¶ 22} On cross-examination, Mercedes testified that she gave a statement under oath to Det. Cooper about her conversation with K.W.   When asked if she and K.W. were close friends at the time, she responded, "We were good friends." Mercedes acknowledged, however, that she had told Det. Cooper that she and K.W. were not very close.   Mercedes testified that she had never been to K.W.'s home and that she and K.W. did not talk on the phone, although they communicated on Snapchat.   Mercedes testified that she had attended school with K.W. for about a year at the time of the conversation in question, and she told Det. Cooper that K.W. had never confided in her before.   Mercedes testified that she told Cooper that K.W. did not describe anything sexual in nature between her and Wright in the course of their conversation, but that she understood K.W. to be describing sexual abuse.   According to Mercedes, K.W. had admitted that she was not asking her question for a friend in the course of their conversation.

{¶ 23} Kayla McEldowney, a seventh and eighth grade math teacher, stated that on December 10, 2019, she was called to the office by the principal, Josh Meyer; K.W. was also brought to the office and asked about the statement she made to Mercedes. K.W. started crying.   McEldowney testified that the principal "decided to step out," and then McEldowney talked with K.W. one-on-one.   According to McEldowney, K.W. stated that her parents were "going to kill" her, that she was going to be in "so much trouble for

saying this," and expressed fear that no one would believe her. McEldowney tried to console K.W., and K.W. said that "she just want[ed] to protect her younger siblings." K.W. told McEldowney that she and Wright had been having "issues" at home, which happened when her mom was at work and it was either just K.W. and Wright at home or only her siblings were at home with them, but K.W. "never came out and said anything" specific about what was happening to McEldowney.

{¶ 24} Continuing to describe her encounter with K.W., McEldowney testified that she asked when this first started, and K.W. indicated it had been happening for a couple of years. K.W. described to McEldowney that, the first time it happened, she and Wright were home alone "with a blanket on them." Defense counsel objected to McEldowney's giving this account on the basis of hearsay, and the trial court overruled the objection.[1] McEldowney then recounted that K.W. had been "very hesitant" and felt "awkward" discussing what had happened, but K.W. said that Wright had "touch[ed] her inappropriately under the blanket"; K.W. said that this had happened multiple times but she did not say more. As a mandatory reporter, McEldowney had to report these statements, so she called the principal back into the room, and the principal called Children's Services and School Resource Officer Cline.

{¶ 25} G.B., K.W.'s maternal grandfather and a registered nurse, testified at trial that he lived in Tennessee with his wife, J.B. On December 11, 2019, G.B. received a call from Wright in which Wright "seemed a little bit excited" and asked about the whereabouts of J.B. G.B testified that Wright said G.B. needed to "get ahold" of J.B. "tell

---

[1] The trial court referenced Evid. R. 801(B)(1)(b) in ruling on the objection, but that section does not exist; we assume that the court was referring to Evid.R. 801(D)(1)(b).

her to stop talking and to get an attorney." According to G.B., at the time, J.B. was with K.W. at the courthouse. G.B. "was pretty upset" with Wright at that time and angrily told Wright that he (Wright) needed to get an attorney. G.B. stated that he had known Wright for six years and this occasion was the only time Wright had ever called him.

{¶ 26} Lieutenant Jason Moore of the Miami County Sheriff's Office testified that on December 10, 2019, he received a call from Detective Cooper and proceeded to the Sheriff's Office with Detective Jessup to assist Cooper. He stated that Cooper briefed him on K.W.'s allegations and what he had been told up to that point. After speaking further with Cooper, Moore obtained a search warrant around 8:00 p.m. for K.W.'s residence "in an effort to locate specific items of clothing or potential evidence" that may have been present there. While he was at the Sheriff's Office, Moore was able to monitor a portion of Cooper's interview with K.W.

{¶ 27} Moore testified that he and Detective Jessup responded to the North Miami Street address and that Mother showed them through the home; K.W.'s bedroom was on the first floor, and he identified photos that he took of the room that day. Moore testified, without objection, that the search was conducted on December 10, two days after the alleged December 8th incident, and that he had been looking for the clothing K.W. described wearing that day (pink shorts, underwear, and some sort of a red shirt); he was also looking for "bedding material" because the reported offense had occurred on K.W.'s bed.

{¶ 28} Moore testified that he removed a laundry tote from the closet and removed clothing "piece by piece" from the top, looking for the clothing described by K.W. He

stated that he wore rubber gloves to protect the integrity of the clothing. Moore found pink shorts, "which was about two days' worth of clothes down into the clothes basket." He also found a couple of red shirts and two or three pairs of underwear in the same part of the basket. Moore described how he packaged the items and turned them in to the Sheriff's Office.

{¶ 29} He stated that K.W.'s bedroom is "quite a distance" from Mother and Wright's room. Moore stated that he also collected an iPad that Mother told him had been K.W.'s before it was taken from her for disciplinary purposes. He also looked for gray sweatpants, which K.W. had said Wright was wearing on December 8; he retrieved two pairs of gray sweatpants from Wright's dresser that were consistent with K.W.'s description of what he wore on the night of the incident. He stated that he also seized K.W.'s bedding.

{¶ 30} Moore testified that he conducted a follow-up interview with K.W. several weeks later. Prior to the interview, he had watched parts of K.W.'s earlier interview with Det. Cooper, but Moore had also relied on what Cooper told him. Moore spoke with K.W. for an hour and 20 or 25 minutes. Moore viewed K.W.'s statements in the second interview as consistent with the first interview; K.W. also provided some new information, which Moore did "not necessarily" find unusual.

{¶ 31} On cross-examination, Moore stated that Wright was not present when the search warrant was executed, and Mother left the house with the children during the search, which lasted about an hour.

{¶ 32} Mary Barger, a forensic scientist in the serology and DNA section of the

Miami Valley Regional Crime Laboratory, stated that she had analyzed several items in this case, including K.W.'s "sexual assault evidence collection kit," her clothing and bedding, and two pairs of sweat pants. Barger identified her report, and she thoroughly detailed the DNA analysis process she employed in testing the items.

{¶ 33} Barger stated that she found a mixed DNA profile on K.W.'s orange underwear, meaning "a mixture of two individuals" from which neither K.W. nor Wright could be excluded; "[t]hat means, as I'm looking at the profile as a whole, I can see both of their unique specific DNA types present and it is mixed together in this sample." She further explained:

> That means that I can see DNA from two separate individuals that is mixed together on the pair of underwear and of that I can see the specific DNA types that can match back to [K.W.] and then the specific DNA types that match back to [Wright]. Together once they're combined it creates a mixed profile, so I can only tell you that he cannot be excluded, which means that I am seeing their DNA types together. If I was not seeing DNA present at all from [Wright], the report would read that [Wright] was excluded as being a possible contributor to that mixed profile.

{¶ 34} Barger further testified, regarding mixed DNA, that "anytime we are either matching it to somebody or are stating they cannot be excluded, we must put a scientific weight to that." She stated that, to calculate the statistic, she used a statistical program created and approved by the FBI. Using this tool, at the most conservative estimate, she concluded that in "roughly one in every 5.9 million individuals [she] might expect to find

another individual that may contribute to this profile," which reflected "the rarity of how common you would expect to find the combination of their two DNA profiles."

{¶ 35} Barger stated that she tested 16 locations on K.W.'s orange underwear, and 12 of them reflected Wright's DNA. When asked if she could tell where the DNA came from, Barger stated that K.W.'s items "were all negative for the presence of semen" but that multiple bodily fluids, such as sweat, saliva, semen, and urine, "all leave a fluorescence behind on fabrics." There "was no fluorescence indicated at all" on K.W.'s clothing. According to Barger, in her experience with testing items like this, the DNA presence indicated that it came from skin contact.

{¶ 36} Barger also testified that she swabbed the "top portion of the waistband" of K.W.'s underwear on the inside and outside; with respect to this sample, she explained that she would expect to find a significant amount of K.W.'s own DNA, because "when you're wearing your own clothing you're constantly moving; you're sloughing off your own skin cells on the clothing that you're wearing," but picking up the DNA of another individual in that location would be "fairly rare" without "a heavy amount of contact." According to Barger, she found more of Wright's DNA than she expected to find on K.W. underwear waistband. She explained:

Each individual is going to shed skin cells at varying amounts. Depending on how vigorous the rubbing was and how many skin cells they standardly would sluff off would dictate how much they would leave behind. In this instance it is enough that we detected a second individual in addition to [K.W.], so I would state that there was probably a fair amount of rubbing.

The more vigorous contact and the more rubbing that you were to have, you would pick up more DNA from that. The more minimal contact that you have and the less skin cells that are sluffed off, the less likely you are to pick another presence of a person's DNA.

Barger stated that she expressed her opinions to a reasonable degree of scientific certainty.

{¶ 37} On cross-examination, Barger explained that fluorescence helps to visualize where there are stains that might reflect the presence of DNA, but that fluorescence does not indicate what substance is present. She also acknowledged that blood, saliva, and semen contain more DNA than touch DNA. She further testified that blood, saliva, and semen had been "ruled * * * out from all the items" she tested.

{¶ 38} Barger stated that the lab's policy was not to test large items, such as bedding, for touch DNA and that no DNA had been detected on the sweatpants she tested. Barger explained that "touch DNA" results from having "exposed skin; you're touching an area; you are literally creating some sort of friction to leave your skin cells behind by touching it." She further testified that, while touch DNA can theoretically spread from one object touching another, "you would have to have a very, very large amount of DNA left on the original item for another individual to touch that item and pick up that person's DNA and have it detected on another item." Barger testified about the number of males, by race, who would potentially match this profile, and stated that, with "male specific testing alone," a match was more likely in non-Caucasian races than Caucasian. She also acknowledged that her report contained a statement that other males in Wright's

family should be tested to exclude possible contribution from another male in the family, but she described this as a "standard statement that goes in every single DNA report" because close male relatives "are going to have the same male specific type." Barger stated that she did not receive any other standards from male relatives of Wright. Barger testified that, with a mixed profile DNA, not excluding Wright as a possible contributor was "as close as you can get with any mixed profile * * * because it's not a single source, meaning one individual matching to the exclusion of all others."

{¶ 39} With respect to not finding DNA on the sweatpants that were taken from a dresser drawer, Barger testified that, if they had been laundered, she would not expect to find DNA at all, and that the amount of touch DNA on the orange underwear would have resulted from "more vigorous contact."

{¶ 40} Dr. Brenda Joyce Miceli, a pediatric psychologist at Dayton Children's Hospital, testified that she primarily works at Care House, a partnership between Dayton Children's Hospital, the Montgomery County Sheriff's Office, the Dayton Police Department, Montgomery County Children's Services, and the Montgomery County Prosecutor's Office, which provides "a multidisciplinary approach to child abuse." Miceli stated that Care House is a place where children can come for interviews and then can be connected with medical and mental health services.

{¶ 41} Miceli defined child sexual abuse as "any contact involving sexual parts between a child and an adult or an older child. It can also involve non-touching, so taking of photographs or exposure of pornography also falls into our definition of child sexual abuse." Miceli stated that her purpose in testifying was to educate the jury about child

sexual abuse in general; she never met or treated K.W. Miceli testified that secrecy and helplessness are two important factors involved with child sexual abuse: the secrecy of the abuse "places a lot of emotional stress on the child trying to figure out how to manage that," and the helplessness comes from the abuser generally having more authority and more control in the relationship, which places the child in a position of not knowing what to do or how to handle the situation.

**{¶ 42}** Miceli described the typical disclosure process for sexually abused children as follows:

Disclosure generally is not something that happens all in one big step for a child. Most children do not disclose immediately. It's engaged in what we call delayed disclosure, so disclosure generally does not happen immediately but there is a period of time before children tell. The research is very clear on that. There's very little contradiction in that particular area. The studies talk about when you look at adults who have experienced sexual abuse that many of them, if you ask them if they've had something happen when they were a child, they will say that it took them an average of about 18 years before they disclosed and many of them, in most of the studies, 20 to 30 percent of them had never told anybody until they were asked in that study. When we look at Children Services records, those records generally indicate that there is a delay of about two years between the time the abuse began and the time it was disclosed.

**{¶ 43}** Miceli stated that adolescents or older tweens often disclose to a peer first

before they tell a trusted adult.   She testified that when children begin to disclose sexual abuse, they often will make a vague statement about something that happened without much detail.   According to Miceli, children often fear that they are going to be in trouble or that they have done something wrong before disclosure; "when they realize that's not the case they may feel more comfortable talking about abuse."   She also testified that children are "less likely to disclose the more embarrassing parts of sexual abuse" initially, such as oral or anal sex.

{¶ 44} Miceli also testified that many kids think that if they didn't disclose after the first event, the other events were their fault because they didn't make it known to other people; this can cause feelings of guilt and responsibility, so "we spend a fair amount of time in counseling addressing that."   She also testified that "memory is very complicated" and does not work like a video camera where details can easily be replayed or recalled. When something has happened multiple times, the ability to store, recall, and recount the details "gets very complicated."   Sometimes what the victim can recall is when the abuse "becomes more intrusive" or when something happened in a different place or outside of the usual pattern.   She stated that one method of coping with such events can be "just to put it in a box in [the] brain and close it off."

{¶ 45} Miceli testified that sexually abused children can exhibit internalizing behaviors such as anxiety, depression, self-harm and sleep disturbance, and/or externalizing behaviors such as anger outbursts, temper tantrums, or aggression.   She also stated that they may also exhibit sexualized behaviors such as masturbation or seeking out sexual material or information, including pornography.   Miceli also stated that

pornography is frequently used as part of "grooming," which is "the process by which an abuser kind of lowers a child's inhibitions and prepares them for abuse." She stated that grooming typically starts with something "mild," such as walking in on a kid in the bathroom or overly long hugs, and it can include showing inappropriate material on television or a computer, which might gradually increase in intensity over time. According to Miceli, grooming works because it increases the chance that a child doesn't know when inappropriate behavior has actually happened and helps to identify a child who will or will not immediately tell a trusted adult what has happened.

{¶ 46} On cross-examination, Miceli acknowledged that she did not review any records in the case and that she was not called to render a medical opinion. She also acknowledged that she had studied some false reports of sex abuse, which could happen for a variety of reasons, including to cover up promiscuity or bad behavior or for revenge.

{¶ 47} Detective Sergeant Todd Cooper of the Miami County Sheriff's Office testified that Lieutenant Moore assigned him to be the lead investigator in this case on December 10, 2019. Cooper was initially contacted by Officer Cline of the Covington Police Department, and he had a victim witness advocate attend his interview with K.W. The interview began around 4:00 p.m. and lasted "quite a while." With respect to the interview, Cooper stated that K.W.'s testimony at trial had been consistent with what she had said during their interview, but his interviewed had focused on the most recent event reported, which had occurred on December 8; more specific information related to the other counts came out during a subsequent interview with Lieutenant Moore. K.W. had described to Cooper the clothing she had been wearing on December 8 as a red shirt,

pink shorts, and underwear, but the underwear she could only narrow down to a couple of pairs.

**{¶ 48}** As to the events of December 8, Cooper testified that in their first interview, K.W. had stated that Wright had not ejaculated, which was consistent with her trial testimony; she had recounted to Cooper that Wright had been "rubbing on her and then removing her underwear but never mentioned ejaculation."

**{¶ 49}** According to Cooper, after the initial interview, K.W. was transported to Children's Hospital, at which time he (Cooper) spoke with Lieutenant Moore, who was already executing a search warrant. Cooper, who was also an evidence technician, described the process of checking in the items Moore had retrieved from K.W.'s home. He identified a picture depicting the clothing collected by Moore; the picture had been presented to K.W., who had circled the clothing that she had been wearing on December 8 at the second interview.

**{¶ 50}** Cooper stated that K.W. was "a little bit more stressed" and "upset" at the second interview than she had been at the initial interview. The second interview with K.W. lasted 45 minutes to an hour, and Cooper also interviewed Mother for 20 minutes. He testified that Mother had "seemed angry" and "in disbelief," but not hostile.

**{¶ 51}** Cooper testified that he applied for a search warrant for Wright's cell phone and a DNA standard, and he served the warrant on Wright on December 12, 2019; a DNA standard from Wright and his cell phone were obtained, and the cell phone was "forensically downloaded." Cooper did not find any of the pornography that was alleged to have been shown to K.W. on Wright's phone. However, "thousands of items" had

been deleted off the phone, including more than one hundred videos, but it could not be determined when these items had been deleted. Cooper noted that they had not obtained Wright's phone for two days after K.W.'s allegations were made.

{¶ 52} Cooper interviewed Wright on the day of his second interview with K.W. He testified that he had picked Wright up at work for the interview, brought him to the Sheriff's Office, and advised him of his rights. Cooper stated that Wright had been "unsure" of the purpose of the interview, but when he was confronted by Cooper with K.W.'s allegations, Wright immediately denied that any of it had occurred. According to Cooper, Wright said that K.W. had "a problem with telling the truth," that she was "making this up," and that he had had disciplinary issues with her. Cooper testified that he had interviewed several of K.W.'s teachers, spoke with school officials and her soccer coaches, and obtained school records in the course of his investigation, and he was told that "there was no noted discipline in her file."

{¶ 53} Dr. Kelly Liker, the Chief of the Division of Child Advocacy and a child abuse pediatrician at Dayton Children's Hospital, testified that she had not met K.W. but had reviewed her medical records; the records from the December 10, 2019, emergency room visit included records from the emergency room physician, the social worker, and the forensic nurse, as well as their documentation and photographs of the exam. Liker testified that the attending physician had concluded that the vaginal exam was normal, and she (Liker) agreed with that assessment. She explained that, during the course of such an exam, the medical professionals are looking for "any signs of injury or infection" or "anything that could be related to the history that's been provided." According to Liker,

a finding that an exam is "normal" does not support or refute a history of sexual abuse, and the majority of children who have been sexually abuse have normal exams. Liker also testified about the physical structure of the hymen, a rim of tissue that is around the opening to the vagina, and what that tissue is like before and after puberty: "pretty resilient" in nature that "typically is designed to expand," and that if it is injured, it "heals fairly quickly," sometimes with scarring but often without scarring.

{¶ 54} Liker identified her report from reviewing K.W.'s records (State's Exhibit 10) and stated that K.W.'s records reflect that she was diagnosed with suspected child sexual abuse from her personal history and constipation.

{¶ 55} At the conclusion of the State's evidence, defense counsel moved for an acquittal, which the trial court overruled.

{¶ 56} Mother testified that she was married to K.W.'s father from 2007 to 2009; K.W. and T.W. were born of that marriage, but when the marriage ended, their father did not maintain contact with the children. Mother met Wright in 2011, and they married in 2012. Two children, A.W. and C.W., were born of this marriage.

{¶ 57} Mother testified that, when the family lived in Covington, she worked at the Upper Valley Medical Center as a patient care technician from 7 p.m.to 7 a.m., and Wright worked as a Covington police officer also working the night shift; Mother stated that she worked three days and then Wright worked three days, such that they alternated schedules. She stated that K.W. was in the fifth grade at the time, and K.W. started her period at some point during the fifth grade.

{¶ 58} Mother stated that she was a light sleeper and did not take any sleep aids.

She stated that she did not "sleep very well at night" listening for her kids and was "kind of a worrier" and "very anxious." Mother stated that friends and family members on both sides of the family were in and out of their home "all the time."

{¶ 59} Mother described the sleeping arrangements among the children and the parents' bedroom at various houses where they had lived. Mother stated that A.W. had shared a room with K.W. from 2017 until after Halloween 2019, but then K.W. "just wanted more privacy" and they moved A.W.'s bed out of K.W.'s room; however, according to Mother, A.W. still "went everywhere with" K.W. and went to K.W.'s room to sleep in K.W.'s bed.

{¶ 60} Mother testified that she heard Wright if he got up in the middle of the night. She stated that their door was "very loud," loud enough to wake you up. She stated that they had two large German Shepherds that "bark at everything" and serve as protection. Mother stated that the dogs were out in the house during the day, and at night they were in the basement in a kennel directly under K.W.'s bedroom.

{¶ 61} Mother stated that there had "always been discipline issues" with K.W. at home. For example, Mother testified that around Halloween 2019, she and Wright discovered that K.W. was singing with a "Smule" application on her tablet after she was supposed to be in bed, and they took her tablet away from her.

{¶ 62} Mother learned of K.W.'s allegations against Wright when Det. Cooper called her. She testified that she told him in the course of her interview that she "didn't believe him" because she knew that her daughter "ma[de] up a lot of things for attention and there was no way it could be true." Mother stated that she spoke to K.W. the next

day at Mother's parents' home and asked K.W. to tell her what had happened, but K.W. wouldn't do so. Mother told K.W. that there would be consequences to her "making up a lie that could affect her family"; according to Mother, K.W. then admitted that she just made the allegations up "because she was mad and that she didn't want to live with" Mother and Wright. Mother stated that K.W. wanted to live with her grandparents but was "too scared she would get into trouble and would go to jail."

{¶ 63} Mother stated that she, grandmother (J.B.), and K.W. returned to the Sheriff's Office; Mother told Det. Cooper that she had spoken to K.W. and "told her that she needed to come and tell the truth" because "we knew she was lying." Mother stated that she had told K.W. that "there would be consequences to her actions," and she also wanted I Cooper "to make it clear" to K.W. that there would be consequences. Mother told Cooper that she did not "want to have to go through this process," meaning the "trial; just go down this whole road" if the allegations were not true. Mother also testified that she told K.W. that, "if it wasn't true they would not find evidence," because "medical professionals don't lie." Mother also stated that she told Det. Cooper that "if there was evidence," she (Mother) "would completely support him and support [her] daughter."

{¶ 64} Mother testified that, on December 8, 2019, the date of one of the alleged incidents, she had worked during the day from 7:00 a.m. to 7:00 p.m., while Wright was home with the three younger children and J.B. took K.W. to a basketball game. She stated that Wright picked up K.W. after the game, then went shopping with all the kids and dropped off coffee to Mother at work. After work, Mother talked with Wright and then went grocery shopping before she went home, arriving home a little after 8:00 p.m.

{¶ 65} According to Mother, that night T.W. slept in his room, K.W. and A.W. slept together, and C.W. slept with her and Wright. Mother stated that between the evening of December 8 into the morning of December 9, 2019, she did not hear Wright get out of bed or go down the stairs and did not hear K.W.'s metal bed rattling on the wood floor or any noises in the house. Mother stated that she took K.W. to school the next day on her way to work, and everything seemed "normal."

{¶ 66} Mother stated that, prior to K.W.'s disclosure, she did not have any suspicions that K.W. was being abused in her home. She stated that she loved K.W., was concerned about her, and would protect her if she needed to be protected. At the time of trial, Mother had not spoken to K.W. in a year and a half. Mother still lived with Wright and the other children; she believed that K.W. was living with a friend.

{¶ 67} On cross-examination, the prosecutor asked Mother if she told Det. Cooper that A.W. had slept with K.W. on December 8, 2019; Mother responded that Cooper had not asked her that question. When asked if that would have been important information to convey to Cooper, Mother responded, "I was protecting my other children." Mother acknowledged that she had seen K.W. "a couple of times" during supervised visitation. Mother denied telling K.W. on December 11, 2019, that she needed to recant or Wright would lose his job.

{¶ 68} H.S. testified that she lived in Covington with her husband, B.S. and their daughter N.S.; she and her husband became friends with Mother and Wright through the soccer program in their town. According to H.S., K.W. and N.S. became friends in 2015, N.S. occasionally spent the night at K.W.'s home, she (H.S.) never had any concerns

about sending her daughter to the home, and she did not have any concerns when K.W. was in her home that K.W. was being abused.

{¶ 69} Wright's stepfather ("Stepfather") testified that in the year preceding December 2019, he went to Mother and Wright's home at least a couple of times a week and had been in every room of the home. Stepfather testified that he had observed A.W.'s bed in K.W.'s room "[a]ll the way up until Thanksgiving time frame," that K.W. never reported being abused, and that he had had no suspicions of abuse.

{¶ 70} Dr. Larry Holland, a board-certified obstetrician and gynecologist, also testified for the defense. Holland acknowledged that he had previously authored reports for defense counsel's office and that defense counsel's office had performed legal services for him in the past, but he said that these past interactions would not impact his ability to be fair and objective in reviewing the records in this case. The parties stipulated that Holland was an expert in gynecology and obstetrics. Holland had reviewed the records in the case and had prepared a report based on his review (Defense Exhibit J). Specifically, Holland testified that he had reviewed K.W.'s three video-taped interviews, and "a PDF on Liker's interpretation of [the] Dayton Children's Report." He stated that he treated K.W.'s interviews like the personal history he would receive from a patient. He then testified as follows::

Q. What important facts did you learn from * * * the interviews[?]

A. From the interviews, obviously the descriptions were the onset, a couple years prior to the initial exam. From that aspect this event happened multiple times. Both with digital penetration and with penile

penetration. If you really listen to her talk, she talks several times about pain and discomfort but never mentioned anything as far as any vaginal bleeding from that discomfort. * * *

* * *

Q. What specific things did you note about how these events allegedly occurred that was helpful to you?

A. Anatomically the way the pelvis is kind of designed in regards to penetration, the anterior part of the female anatomy is a barrier that you can't push against, so if there's penetration, either digitally or with the penis, most likely it pushes it posteriorly and when you push posteriorly in that regard you expect that there would be not only pain but potentially bleeding as well and if it does push it posteriorly in what we could classify as a non-estrogenized hymen I would expect there would be a tear associated with that or a cleft or something on the hymen to demonstrate that there was penetration to cause that pain because the hymen really doesn't have very many nerve fibers in it. If you don't have nerves you have no feeling, but the vagina does and the vagina in a prepubescent girl is very, very thin. * * * [S]o if the penis would push against that, I would expect not only discomfort and pain but also potentially bleeding.

**{¶ 71}** Holland testified about "Tanner Staging" with respect to female development. He stated that "[w]e can rate females all the way from Tanner I to Tanner V in regards to development and that all correlates with how the breasts are developing

and how the pubic hair is developing. It has nothing to do with the hymen or the vagina." He stated that in the later Tanner stages, when the vagina "becomes estrogenized," "it's a totally different story, but early on when they're at an early Tanner Stage that hymen is very non-flexible" and "more prone to injury because it's not elastic, non-stretchable." He also testified that some patients who have reported sexual abuse have a normal physical examination. Holland stated that it is best to examine patients within 24 hours of the abuse, "but up to 72 hours there may be residual signs as far as erythema; blood vessels that are broken; tears you could see * * * ."

{¶ 72} Holland testified that he had reviewed Dr. Liker's report, which concluded that K.W.'s exam was normal, but had not seen other records from Dayton Children's. He further testified to his impressions as follows:

A. Obviously, in this type of situation, the medical exam is part of the evidence. The rest of it is - - this is a legal definition. It's not a medical definition. From that perspective, I don't think you can use just one part as the entire decision making, so you have to look at all the evidence from that perspective. From Dr. Liker's interpretation of a normal exam from when these episodes initially occurred, and at that time, in my opinion, the vagina would have been very thin and the hymen would have been elastic [sic] and non-stretchable. I would expect from that a couple different things. One is, obviously the pain that she described, but two is I would also expect potential bleeding and almost 80% of the time in a prepubertal girl, someone that has not begun their menstrual cycle yet, in an unestrogenized vagina,

that you would see some kind of residual damage. Now, if it's a partial tear, potentially that can heal and we can see that. If it's a complete cleft or a trans-section through the hymen into the vagina, those typically will not repair on their own unless you actually suture them back together and as far as I know from this case her only exam was the Monday after the last episode and there was never any surgical intervention in this case.

* * *

Q. Dr. Holland, in reviewing these documents and these interviews, do you have an opinion whether there is a tear in the hymen?

A. I can only go on Dr. Liker's interpretation of her normal exam. Her normal exam - - - it all depends, too, on how the exam was done. In Dr. Liker's report that I reviewed, it did not say whether it was - - - there's three different ways to do it. Supine labia separation is when they're laying on their back and you just barely look at the vaginal orifice. Supine traction is laying the exact same way but now you're actually pulling on the labia and trying to separate them. The other one is a knee to chest prone position where they're actually on their hands and knees. This gives you a better view of the hymen, but remember this exam was done at a time when her Tanner Stage would have changed. The interpretation two years earlier is what is what I kind of feel would have been a tear. Could they have seen it on this exam? Should they have seen it on this exam? I would expect them to have seen it if indeed there was a complete tear.

{¶ 73} When asked to do so by the prosecutor, Holland read the last sentence from his report as follows: "To the best of my ability I do not find any compelling evidence that any vaginal penetration has occurred" to K.W. Based on the personal history provided by K.W. and the "age of onset" on her abuse, Holland testified that he would have expected to find an abnormal physical exam. When additional information was provided to Holland about the methods used to conduct the examination of K.W.'s hymen, he acknowledged that all three methods had been used to conduct K.W.'s exam, which was "the best case scenario."

{¶ 74} When Holland was asked if he had any formal training in the area of child sexual abuse, Holland testified that a "general OBGYN is not forensically trained." Holland also acknowledged a statement in his report that "the absence of injury to the hymen should not be used as a reason to negate the possibility of vaginal penetration"; in other words, he stated that a normal exam is not indicative of abuse, nor does it indicate that abuse did not happen. Based on Holland's testimony, he was not provided with all three reports from Dayton Children's Hospital that had been provided to the defense. However, he reiterated:

> * * * [A] normal exam doesn't prove or disprove anything. The most critical timing is related to when the event occurred and in the female what the estrogen status was. That to me is the most important thing because if someone has an unestrogenized vagina and they have penetration, the likelihood of injury is pretty high. It's different in someone that has an estrogenized vagina, so a normal exam could mean, yes, there was, or no,

there wasn't.   * * *

{¶ 75} He continued:

Q.   Sir, did anything [the prosecutor] ask[ed] you cause you to change your opinion that this patient's medical history is inconsistent with a normal exam?

A.   No, because actually it helped me form my opinion because the exam that was done I was not aware in Dr. Liker's report in regards to the way the exam was done and they did do all three exam positions.   They did do a colposcopy exam, which is better than the naked eye.   It actually magnifies the area so you can see things a little bit clearer and actually you can pick up things later on than you would with just looking at it with your naked eye, so, I think, if anything, it clarified my opinion in regards to the fact that they did do all the things I would have expected them to do, plus they use[d] an additional device to help look at the perineum.   More than just the naked eye.

{¶ 76} Wright testified that he graduated from Covington High School in 2005 and joined the Navy in 2009.   K.W. was three years old when he began dating Mother in August 2011; he married Mother in February 2012.   After initially living in Georgia, they moved to Ohio in 2014.   Wright testified that he had been honorably discharged from the Navy and had graduated from Edison State in 2016, at which time he was accepted into the police academy.    Wright stated that he was hired by the Covington Police Department in March 2016 and remained there until September 2018, when he joined the

West Milton Police Department. Wright resigned from the West Milton Police Department in June 2020.

{¶ 77} Wright stated that he had adopted K.W. and T.W. because he loved them as his own children and had been in their lives since they were very young, serving in the role of father. Wright stated that the adoption was official in June 2016 and that the children were "included with everything we do in life."

{¶ 78} Wright testified to the sleeping arrangements at their Covington house. Like Mother, he testified that A.W. had moved into K.W.'s room after C.W. was born, and A.W. and K.W. had been "inseparable." Wright also stated that the girls shared a room "the entire time" the family lived in West Milton "until this accusation." He stated that his and Mother's bedroom was "kind of diagonal" to K.W.'s bedroom and that the interior walls of the house definitely did not have insulation.

{¶ 79} Wright stated that K.W. had a bullying issue at school and that he was "the one that filed the police report and called the police to start." He also testified that he had allowed K.W. to download the "Smule app," and that once from their bedroom they had heard K.W. singing on the app in her bedroom late at night, when she should not have been on the app. In response, Wright and Mother confronted K.W. about it and took the tablet away; at that point, Mother "discovered a lot of very inappropriate messages with people" on the tablet.

{¶ 80} Wright testified that December 10, 2019, was a Tuesday, and that he had worked the night before, so he would probably have slept until sometimes in the afternoon. He returned to work at 7:00 p.m. that evening. While he was at work, his

sergeant informed him that someone was coming to talk with him (Wright); Det. Cooper arrived and asked Wright to go to the Miami County Sheriff's Department with him, stating, "I have some stuff I want to talk to you about." Wright agreed to do so.

**{¶ 81}** Wright testified that he told Cooper he "had no idea" why he was at the Sheriff's Department and asked Cooper if his family was okay; Cooper told him it was about K.W. Wright testified that he had no idea what K.W. would have said except that she might have claimed he was being mean to her. Cooper then informed Wright that officers were already at his house with a search warrant, and Cooper asked Wright to tell Cooper whether he had ever touched K.W. Wright described his response as "indescribable" and denied that he would ever do anything like that. He also said it was the first time he had ever heard such an allegation. Wright testified that he was supportive of the search warrant and told Cooper to "take whatever you want, we have nothing to hide." Wright stated that, after the interview, Cooper returned him to the West Milton Police Department, and he (Wright) went back home that night. According to Wright, a couple of days later Cooper and another deputy came to his home "to get a swab and [his] cell phone," to which Wright agreed.

**{¶ 82}** Wright testified that on December 8, 2019, he picked K.W. up at school after her basketball game, and Mother got home around 8:00 p.m. after work. He stated that no one left the residence that evening. Wright stated that, as usual, K.W. and T.W. took showers after dinner and went to their bedrooms, and he and Mother watched television with A.W. and C.W. until they fell asleep. According to Wright, the children all slept where they usually did that night: K.W. and T.W. slept in their beds, with T.W. upstairs

and K.W. downstairs, and A.W. eventually lay down with K.W. (He did not specifiy where C.W. slept.). Wright testified that he slept beside Mother and "absolutely [did] not" leave the bedroom that night.

{¶ 83} Wright stated that the doors in the home are "loud" and "clinky." He also stated that the next day, on December 9, 2019, there was no discussion of any incident the night before, and that Mother drove K.W. and T.W. to school as usual.

{¶ 84} When asked if he remembered anything that happened on November 30, 2019, Wright stated that, because he had been off on the weekend of December 8th he would have worked the weekend before on worked Friday, Saturday and Sunday. He identified his timesheets from November 27, 2019 to December 10, 2019, reflecting that he worked 12 hour shifts on Friday, November 29, 2019, and Saturday, November 30, 2019, from 7:00 p.m. until 7:00 a.m. (Defense Exhibit F); he worked an eight-hour shift on Sunday, December 1, 2019, from 11:00 p.m. to 7:00 a.m. Wright testified that December 1, 2019, was C.W.'s birthday, so he went to work late that day in order to attend C.W.'s party along with his and Mother's family members. Wright stated that nothing unusual happened in relation to K.W. Wright denied that he had ever asked K.W. about starting her period, talked with her about "the change," touched her under a blanket or in any inappropriate way, or "performed oral sex" on her. He described the accusations as "gut wrenching." Wright further denied making K.W. perform oral sex on him, digitally penetrating her, having sex with her, ejaculating on her body or in her vagina, giving her a sex toy, and showing her pornography.

{¶ 85} Regarding his service in the Covington and West Milton police departments,

Wright testified on cross-examination that there were no "detective sections" in those departments because they were small, so officers "have to work their own cases" with the help of others and the Chief. Wright also testified that he had been trained at the academy in how to investigate a case, how to collect and evaluate evidence, how to present a case to the prosecutor, and "what helps a case and * * * what hurts a case."

{¶ 86} When asked if he told law enforcement that A.W. slept in bed with K.W. every night, Wright responded that he had never been asked that question. When asked if he hadn't thought it was important to relay that information, Wright explained that even if you "understand how to investigate a case, * * * when you're being questioned you're not thinking of all that type of stuff."

{¶ 87} At the conclusion of Wright's testimony and the admission of exhibits, defense counsel renewed the Crim.R. 29 motion for acquittal, and the court denied the motion. Wright was convicted and sentenced as described above.

{¶ 88} Wright asserts 10 assignments of error on appeal. His first assignment of error is:

> THE TRIAL COURT COMMITTED PLAIN ERROR BY ADMITTING IMPROPER HEARSAY EVIDENCE IN VIOLATION OF THE RULES OF EVIDENCE AND APPELLANT'S RIGHTS TO CONFRONTATION AND TO DUE PROCESS OF LAW AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

**{¶ 89}** Based on School Resource Officer Cline's testimony that the school principal had reported to him that a student claimed to have been abused by Wright, Wright asserts that the jury "heard the substance of [K.W.'s] allegations before she ever took the stand." The State responds that Cline's statements were not offered for the truth of the matter asserted or to corroborate K.W.'s testimony, but to explain how he became involved with the case.

**{¶ 90}** Wright also claims that some witnesses who testified after K.W., including Mercedes and McEldowney, were allowed to testify to hearsay statements. Specifically, Mercedes testified about statements K.W. had made to her, to Mother, and to the principal about the abuse by Wright, and McEldowney "repeated [K.W.'s] prior statements with even more detail." Wright asserts that K.W.'s motive to fabricate – to avoid discipline and/or leave the home to live with her grandparents – occurred before the proposed statements, and the hearsay statements "must be made *before* the alleged motive to fabricate arose" in order to fall within Evid.R. 801(B)(1)(b), so these statements did not qualify.

**{¶ 91}** Wright further asserts that Cooper's testimony about what K.W. told him she had been wearing (pink shorts and a red shirt) and his recounting of their conversation, including Wright's "rubbing on her and then removing her underwear," and Cooper's testimony that he was informed by school personnel that no discipline had been noted in K.W.'s file, all constituted inadmissible hearsay.

**{¶ 92}** Wright asserts that Lieutenant Moore added yet another layer of hearsay by repeating what Cooper had told him about K.W.'s clothing at trial and "far exceeded what

was relevant" to explain the officer's conduct. He argues that the danger of unfair prejudice (by bolstering K.W.'s credibility) substantially outweighed any marginal relevance of this testimony. Wright notes that Cooper specifically stated that K.W.'s out of court statements about the events of December 8, 2019, were "[e]xactly what she testified to" at trial, which eliminates any question that the statements were offered to bolster K.W.'s credibility.

{¶ 93} Wright further asserts that having multiple people (K.W.'s friend, her teacher, and three police officers) repeat her prior statements could only have been intended to establish K.W.'s consistency. Wright analogizes his case to *State v. Presley,* 10th Dist. Franklin No. 02AP-1354, 2003-Ohio-6069, which also involved police officer testimony about conversations with the victim, no corroborating witnesses, inconclusive physical evidence, and an absence of independent proof; the court of appeals found that the trial court had improperly admitted hearsay evidence. Wright acknowledges, however, that with one exception during McEldowney's testimony, he did not object to the testimony in question, and it is subject to plain error review.

{¶ 94} The State responds that the alleged motive to fabricate mentioned in Evid.R. 801(d)(1)(B) must have been formed before the prior statements were made. The State points out that part of Wright's theory of the case, as set forth in opening statements, was that K.W. made the allegations against him in response to the discipline he imposed, including taking electronics away, and then K.W. "started telling her grandmother that she wanted to live with her." The State also points to K.W.'s testimony that she told her grandmother she wanted to live with her a year or more after the last

time she was abused. Thus, according to the State, the record makes clear that K.W. did not have any desire to live with her grandmother prior to her out of court statements, and "it cannot be legitimately argued that [K.W.'s] subsequent desire to live with her grandmother can be used to preclude her prior statements," as Wright claims. The State also notes that no other witness in the case claimed that K.W. had a motive to lie "or that any such motive was present prior to her making any of the statements in question."

{¶ 95} The State asserts that *Presley* is distinguishable because, although K.W. was accused of an improper motive, Wright failed to demonstrate that such motive was formed prior to the time she made her out-of-court statements. The State argues that Wright's suggestion that the physical evidence was "inconclusive" is inaccurate, citing the touch DNA evidence found on K.W.'s underwear.

{¶ 96} The State asserts that the testimony of Lieutenant Moore and Det. Cooper regarding K.W.'s prior statements was appropriately admitted under Evid.R. 801(D)(1)(b), but it concedes that Moore's testimony about statements K.W. made to Det. Cooper, which Moore did not personally hear, was hearsay. However, the State argues that this hearsay testimony did not impact the jury's finding of guilt and that Wright was not unfairly prejudiced by it.

{¶ 97} According to the State, the admission of McEldowney's alleged hearsay statements, to which the defense objected at trial, is subject to review for abuse of discretion. The State asserts that McEldowney's statements were properly admitted as prior consistent statements under Evid.R. 801(D)(1)(b). With respect to statements to

which Wright did not object at trial, the State points out that we review only for plain error.

{¶ 98} "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). "Hearsay is generally not admissible, except as provided by the U.S. or Ohio Constitutions, by statute or court rule. Evid.R. 802. We review a trial court's evidentiary rulings for an abuse of discretion, provided an objection is made at trial." *State v. Ali*, 2d Dist. Clark No. 2014-CA-59, 2015-Ohio-1472, ¶ 13, citing *State v. Cunningham,* 2d Dist. Clark No. 2011-CA-32, 2012-Ohio-2333, ¶ 22.

> " 'Abuse of discretion' has been described as including a ruling that
> lacks a 'sound reasoning process.' " *State v. Morris*, 132 Ohio St.3d 337,
> 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14, quoting *AAAA Ents., Inc. v. River
> Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161,
> 553 N.E.2d 597 (1990). It also includes arbitrary or unconscionable
> decisions. [*Id.*]

*State v. Mitchell*, 2019-Ohio-2465, 139 N.E.3d 556, ¶ 20 (2d Dist.).

{¶ 99} Evid.R. 801 provides:

> (D) Statements That Are Not Hearsay. A statement is not hearsay if: (1)
> *Prior Statement by Witness.* The declarant testifies at trial or hearing and
> is subject to examination concerning the statement, and the statement is
> * * * (b) consistent with declarant's testimony and is offered to rebut an
> express or implied charge against declarant of recent fabrication or
> improper influence or motive * * *

**{¶ 100}** As noted by the Eighth District:

Courts have repeatedly held that attacking a victim's credibility during opening statements is grounds for permitting a prior consistent statement into evidence under Evid.R. 801(D)(1)(b). *State v. Abdussatar*, 8th Dist. Cuyahoga No. 86406, 2006-Ohio-803, ¶ 15 (finding that because defense counsel contended in his opening statement that the victim fabricated the rape, and because the victim testified and was subject to cross-examination, the trial court did not err by allowing a prior consistent statement in a letter to be admitted into evidence); *State v. Hunt*, 10th Dist. Franklin No. 12AP-103, 2013-Ohio-5326, ¶ 39 (stating that defense counsel's opening statement implied that the victim had been untruthful in her statements to police and therefore this allegation of recent fabrication or improper influence permitted the state to introduce the victim's prior consistent statements to rehabilitate her testimony); *State v. Crawford*, 5th Dist. Richland No. 07 CA 116, 2008-Ohio-6260, ¶ 64 (noting that implications of fabrication during opening statements are sufficient to allow the state's use of Evid.R. 801(D)(1)(b).

*State v. Black*, 2019-Ohio-4977, 149 N.E.3d 1132, ¶ 26 (8th Dist.).

**{¶ 101}** This Court has noted:

It is well-settled that failure to object waives all but plain error. *State v. Bahns*, 185 Ohio App.3d 805, 2009-Ohio-5525, 925 N.E.2d 1025, ¶ 25 (2d Dist.), citing *McBride v. Quebe*, 2d Dist. Montgomery No. 21310, 2006-

Ohio-5128. "Plain error exists 'if the trial outcome would clearly have been different, absent the alleged error in the trial court proceedings.' " *Id.*, citing *State v. Rollins*, 2d Dist. Clark No. 2005-CA-10, 2006-Ohio-5399.

*State v. Kessel*, 2019-Ohio-1381, 133 N.E.3d 1086, ¶ 33 (2d Dist.).

{¶ 102} Regarding Cline's testimony, Wright did not object to his statement about receiving the call from the principal about a child who had been sexually abused by Wright, so Wright forfeited all but plain error review. We agree with the State that Cline's statement regarding this call was not hearsay because it was not offered to establish the truth of the principal's statement, but rather to provide context for understanding Cline's actions in responding to the school to investigate. "A declarant's out of court statements are admissible to explain the actions of a witness to whom the statement was made." *State v. Parker*, 2d Dist. Montgomery No. 18926, 2002-Ohio-3920, ¶ 50, citing *State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980). If a statement is not offered to prove the truth of the matter asserted then it does not constitute hearsay. *Id.*

{¶ 103} Wright also did not object to Mercedes's testimony, so he again forfeited all but plain error review. We cannot conclude that in the absence of Mercedes's testimony, the jury would have found Wright not guilty. Mercedes testified after K.W. at trial, and her statement about Wright's "doing things to" K.W. was consistent with K.W.'s own testimony about her conversation with Mercedes. Further, because defense counsel argued in opening statements that K.W. had been angry about having her phone and tablet taken from her by Wright for disciplinary reasons and that she had fabricated her allegations of abuse as a means to leave Wright's home and live with her

grandmother, Mercedes's statements were admissible pursuant to Evid.R. 801(D)(1)(b). Even if we were to conclude that the alleged confirmation to Mercedes by school personnel that K.W. had been abused by Wright were inadmissible hearsay, plain error is not demonstrated, because we cannot conclude that in the absence of the statement, the jury would have found Wright not guilty.

{¶ 104} Defense counsel did object to McEldowney's testimony about her conversation with K.W., and the court overruled the objection. However, an abuse of discretion is not demonstrated. McEldowney's testimony was not hearsay because it was admissible pursuant to Evid.R. 801(D)(1). McEldowney's testimony about her conversation with K.W. was consistent with K.W.'s prior testimony and was introduced to refute defense counsel's assertion that K.W. had fabricated her allegations because she was angry at Wright.

{¶ 105} Regarding Moore's testimony about being briefed by Cooper as to the clothing K.W. reported wearing on December 8, 2019, the State concedes that Moore's testimony with respect to statements made to Cooper by K.W. that Moore did not personally hear was hearsay, as noted above, and we agree. Defense counsel failed to object, however, and forfeited all but plain error review. We cannot conclude that the jury would have found Wright not guilty in the absence of Moore's testimony about being briefed by Cooper.

{¶ 106} Finally, as to Cooper's testimony, Wright cites as hearsay Cooper's descriptions of the clothing K.W. wore on December 8, the photograph of the clothing taken by Cooper reflecting the items circled by K.W., and Cooper's description of Wright's

"rubbing on her" before removing her underwear and failing to ejaculate. Cooper testified without objection, and we cannot conclude that plain error is demonstrated. We further conclude that the statements and photograph at issue were properly admitted to confirm the clothing worn by K.W. on December 8, 2019.

{¶ 107} Further, we agree with the State that *Presley,* 10th Dist. Franklin No. 02AP-1354, 2003-Ohio-6069, is distinguishable. In *Presley*, Detective Fullen, who interviewed the victim (Josie), "on redirect examination, over the objection of defense counsel, * * * recounted statements Josie made during the interview concerning a diagram she made regarding the incidents." *Id*. at ¶ 12. On appeal, Presley argued that, after the State presented Josie's testimony, Detective Fullen "was improperly permitted to bolster Josie's testimony through a hearsay document and corresponding statements made by Josie during her interview with Fullen." *Id.* at ¶ 19.

{¶ 108} The Tenth District noted in *Presley*:

> The record reveals that, on cross-examination, defense counsel questioned Fullen regarding the thoroughness of her investigation. This questioning revealed that Fullen's investigation was essentially limited to an interview with Josie in April 2001. As she had previously testified on direct examination, she averred that she did not conduct interviews with Josie's siblings, relatives, neighbors, babysitters, classmates, teachers, or other school personnel because the history Josie reported in the interview did not suggest that anyone had either seen or had any reason to suspect sexual abuse. Similarly, Fullen testified that she did not visit the scenes where the

alleged criminal acts took place and neither took photographs nor collected physical evidence because the alleged abuse had not been reported until well after it occurred; thus, no physical evidence remained to be collected. Fullen explained that she did not need to conduct any additional investigation, as the history provided by Josie did not establish that any further investigation was necessary. Toward the end of cross-examination, defense counsel inquired as to whether there was any "independent proof" of the crime other than the history Josie recounted during the interview. Fullen testified that there was nothing to add to that history.

On re-direct examination, the prosecution sought to admit a diagram prepared by Josie during her interview with Fullen. The diagram included two separate images and the word "sex." (State's Exh. 6.) Over defense counsel's objection, Fullen referenced the diagram repeatedly, explaining what Josie told her as she prepared the diagram. In particular, Fullen testified that the first image was Josie's depiction of a penis. Fullen further testified that the second image was two stick figures depicting the positions Josie and defendant would be in when they were performing oral sex on each other. Finally, Fullen testified that Josie wrote the word "sex" in response to her question about whether defendant showed her pornographic videotapes.

*Id.* at ¶ 20-21.

**{¶ 109}** The Tenth District held:

We agree with defendant's contention that the diagram created by Josie and her corresponding statements to Fullen qualified as hearsay and were improperly admitted at trial. Josie created the diagram during the course of her interview with Fullen in an effort to explain her allegations. Josie then made statements describing the diagram and what it represented. Both the diagram and the statements were out-of-court assertions by Josie to Fullen. In general, although "some hearsay statements are admissible in criminal proceedings," such statements are admissible only when, "after a good faith effort by the prosecution to produce her, the declarant is unavailable to testify." *State v. Self* (1990), 56 Ohio St.3d 73, 81-82, 564 N.E.2d 446. In the instant case, Josie cannot be said to have been unavailable to testify, since she appeared at trial.

At trial, the prosecution argued that the diagram and Josie's corresponding statements to Fullen were admissible and non-hearsay because they were offered not to prove the truth of the matter asserted therein, but to rebut defense counsel's cross-examination regarding the alleged inadequacies of Fullen's investigation. More specifically, the prosecution maintained that the diagram and statements were not hearsay because they were offered only as "additional corroboration" of the crime apart from the history Josie provided during the interview. According to the prosecution, this "additional corroboration" explained why Fullen did not

conduct further investigation beyond interviewing Josie. The trial court adopted this position and permitted the prosecution to submit the diagram as an exhibit.

*Presley* at ¶ 24-25.

**{¶ 110}** The Tenth District noted in *Presley* that "the tenor of cross-examination was to demonstrate that Fullen failed to conduct any meaningful investigation beyond interviewing Josie," and the diagram could not be used "to demonstrate that Fullen did more than interview Josie, as the diagram was inextricably linked to the interview." *Id.* at ¶ 26. The opinion found it significant that the trial court permitted the prosecution to offer "considerably more than the diagram": specifically, the prosecution questioned Fullen about what was depicted in the diagram, and she provided a detailed explanation of what Josie had told her while creating the diagram and writing on it. *Id.* at ¶ 27. The Tenth District observed:

> * * * If the court's rationale was that the diagram demonstrated that more than a simple interview was conducted, this goal was met when Fullen explained that Josie created a diagram during the interview. Under the theory espoused by the prosecution and adopted by the court, the existence, not the substance and content, of the diagram was important. Thus, by admitting the content of the drawing along with Josie's out-of-court statements to Fullen, the court far exceeded the alleged admissible purpose.

*Id.*

**{¶ 111}** The Tenth District noted that if "the intended purpose of the diagram and Josie's statements to Fullen as to what the diagram represented was to demonstrate that no additional investigation was necessary, then these statements were necessarily offered for their truth," and if "the diagram was offered to corroborate Josie's statements, then it was offered to establish the truth of its contents." *Id.* at ¶ 29.

**{¶ 112}** The Tenth District concluded as follows:

> Upon review of the record, we are unable to conclude that the evidence against defendant was so overwhelming that the jury could not have been reasonably influenced by the hearsay testimony in which Fullen was permitted to essentially repeat Josie's story. The determinative issue in this case was credibility, i.e., whether the jury chose to believe the testimony of Josie or defendant. There was no conclusive physical evidence, no corroborating witnesses, and no independent proof of Josie's allegations. In order to convict defendant, the jury had to believe Josie. The effect of permitting the hearsay evidence offered by Fullen was to bolster Josie's testimony and her credibility. Moreover, the effect of this error was not diminished by the fact that Josie testified at trial and was subject to cross-examination. *State v. Lewis* (Apr. 28, 1994), Franklin App. No. 93AP-911. In considering the effect of the error at trial in a case where the issue of credibility was determinative, we cannot conclude that such error was harmless beyond a reasonable doubt. * * *

*Id.* at ¶ 34.

{¶ 113} In Wright's case, we conclude that his argument that Det. Cooper's testimony about K.W. and the photo of the clothing she circled "only served to bolster the testimony and credibility" of K.W. is without merit. K.W. testified about what she wore and about Wright's conduct on December 8, 2019. As noted above, defense counsel's opening statement paved the way for rehabilitative testimony in the form of K.W.'s prior consistent statements. Cooper, like the other witnesses above, testified as to what K.W. had said out of court which was consistent with her trial testimony.

{¶ 114} Finally, regarding Cooper's testimony that he learned from school personnel that K.W.'s file contained no noted discipline, even if we were to find those statements to be improper hearsay, we would not conclude that the jury would have found Wright not guilty in the absence of those statements.

{¶ 115} For the foregoing reasons, Wright's first assignment of error is overruled.

{¶ 116} Wright's second assignment of error states:

THE TRIAL COURT ERRED BY ADMITTING IMPROPER TESTIMONY VOUCHING FOR THE VERACITY AND CREDIBILITY OF THE ALLEGED VICTIM IN VIOLATION OF THE RULES OF EVIDENCE AND APPELLANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

{¶ 117} In this assignment of error, Wright points to Cooper's testimony that K.W.'s trial testimony was consistent with what she related to him in her interview and Moore's

testimony that K.W.'s statements in his follow-up interview were "consistent" with her prior statements to Cooper, although some additional information was also provided. According to Wright, Cooper's and Moore's testimonies were "based upon inadmissible hearsay" and improperly vouched for K.W.'s credibility. Wright asserts that in the follow-up interview with Moore, K.W. actually "added allegations" that were not included in her initial statement to Cooper and as such, her second interview was not actually consistent with her first and Moore's characterization was inaccurate. Wright asserts that Moore " 'was giving opinions about the present case based upon * * * previous experiences with other cases,' " citing *State v. Huff*, 145 Ohio App.3d 555, 561, 763 N.E.2d 695 (1st Dist. 2001) in support of his argument.

{¶ 118} Finally, Wright asserts that Moore and Cooper were experienced police officers who "presented with an air of experience, knowledge, and reliability" such that their statements implying that they believed K.W. was credible improperly vouched for her, affected the outcome of the trial, and deprived Wright of a fair trial.

{¶ 119} The State responds that Cooper and Moore simply testified to K.W.'s prior consistent statements, which were properly admitted by the trial court for the reasons discussed in its argument under the first assignment of error. The State argues that neither Moore nor Cooper vouched for K.W.'s credibility.

{¶ 120} "[A] witness is generally not allowed to testify regarding the veracity of another witness, as questions of credibility are solely within the province of the jury." (Citations omitted.) *State v. Williams,* 2d Dist. Montgomery No. 26369, 2016-Ohio-322, ¶ 42. " 'Only statements directly supporting the veracity of a child witness are

prohibited,' " as opposed to " 'indirect bolstering' " of a victim's credibility. *Id.*, quoting *State v. Cashin,* 10th Dist. Franklin No. 09AP-367, 2009-Ohio-6419, ¶ 20.

{¶ 121} In *Huff,* 145 Ohio App.3d 555, 561, 763 N.E.2d 695 (1st Dist.), the First District determined:

> The opinion of a witness as to whether another witness is being truthful is inadmissible. Lieutenant Smith's and Detective Cox's "opinion [that the victims were credible] acted as a litmus test of the key issue in the case and infringed upon the role of the fact finder, who is charged with making determinations of veracity and credibility. * * * In our system of justice, it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of the witnesses." The fact that the vouching witnesses were police officers caused even more of a problem. "[J]urors are likely to perceive police officers as expert witnesses, especially when such officers are giving opinions about the present case based upon their previous experiences with other cases."

(Footnote omitted.) *Id.* at *561.

{¶ 122} There was no objection to Cooper's and Moore's testimony regarding K.W.'s consistency, so Wright has forfeited all but plain error review. We cannot conclude that, in the absence of the officer's testimony, the jury would have found Wright not guilty. We further agree with the State that Moore and Cooper did not vouch for K.W.'s credibility. Moore testified that K.W.'s statements in his follow-up interview of her were consistent with the portion of her interview with Cooper that he had observed and

the information he had received from Cooper. Cooper testified that K.W.'s trial testimony was consistent with what she had told him in the course of his interview of her. Neither Moore nor Cooper opined as to K.W.'s veracity in raising the allegations of abuse.

**{¶ 123}** Wright's second assignment of error is overruled.

**{¶ 124}** Wright's third assignment of error states:

THE TRIAL COURT COMMITTED PLAIN ERROR BY PERMITTING TESTIMONY FROM A STATE EXPERT IN VIOLATION OF OHIO CRIMINAL RULE 16(K), THEREBY DEPRIVING APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

**{¶ 125}** Wright notes that the State called Dr. Kelly Liker and admitted her report (State's Exh. 10) to explain K.W.'s lack of physical injury. He contends that Liker's report stated that "the 'majority of pediatric patients presenting' for suspected sexual abuse 'have **no** genital or anal abnormality on examination' " and listed the reasons why, but her trial testimony "far exceeded the scope of the report." He points to Liker's testimony regarding the nature of the hymen. According to Wright, Liker's report did not detail "anything about the anatomy of the hymen, tears and scaring of the hymen, whether a hymen would heal * * * or how puberty and estrogenization impacted the findings," yet Liker testified about these matters. He cites *State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44.

**{¶ 126}** The State responds that Liker "provided a proper and concise summary, and her testimony expounded on that summary in order to explain how she arrived at the opinions contained in her summary." The State asserts that her testimony regarding the hymen was "intimately connected to and related to the statements in her report." The State asserts that any suggestion that an expert witness cannot explain how she arrived at the opinions contained in a report she authored "defies common sense."

**{¶ 127}** Liker testified without objection. Liker's report provides that she was asked by the prosecutor's office to review the findings for K.W., who presented to Children's Hospital on December 10, 2019, following her report of "chronic/ongoing sexual abuse" by Wright, which reportedly had genital to genital contact." The report contained the following statement:

Reasons for the finding of a "normal" anogenital examination in patients presenting with concerns of sexual maltreatment may include:

* * *

Estrogenized hymenal tissue and anal tissue are both distensible and "elastic" in nature, and may allow for penetration without residual injury.

**{¶ 128}** In *Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, an autopsy report had not contained all the opinions that the State ultimately sought to elicit from the deputy coroner at trial. The question, then, was whether Crim.R. 16(K) required the court to exclude the deputy coroner's testimony to the extent that it went beyond the scope of her written autopsy report. *Id.* at ¶ 47. The Ohio Supreme Court noted:

Consistent with the overall purpose of Crim.R. 16, lower courts have

found that " '[t]he purpose of Crim.R. 16(K) is to avoid unfair surprise by providing notice to the defense and allowing the defense an opportunity to challenge the expert's findings, analysis, or qualifications, possibly with the support of an adverse expert who could discredit the opinion after carefully reviewing the written report.' " *State v. Fetty,* 11th Dist. Portage No. 2011-P-0091, 2012-Ohio-6127, ¶ 36, quoting *State v. Perry*, 11th Dist. Lake No. 2011-L-125, 2012-Ohio-4888, ¶ 55; *see also State v. Buck*, 2017-Ohio-273, 81 N.E.3d 895, ¶ 33 (9th Dist.).

*Id*. at ¶ 48.

{¶ 129} We agree with the State that Liker's testimony did not go beyond the scope of her report. Her report was addressed in part to the reasons someone reporting sexual abuse may have a normal exam, and she specifically opined that due to the elasticity of an estrogenized hymen, injury may not result from penetration. Liker merely explained the conclusion reflected in her report. Accordingly, Wright's third assignment of error is overruled.

{¶ 130} Wright's fourth assignment of error is as follows:

THE STATE COMMITTED PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT BY APPEALING TO THE SYMPATHY OF [THE] JURY, MISSTATING THE EVIDENCE, IMPUGNING THE DEFENSE BY NAME CALLING, AND BY APPEALING TO THE PASSIONS AND PREJUDICES OF THE JURY. THIS DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH, SIXTH, AND

FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

{¶ 131} Wright directs our attention to multiple instances of alleged prosecutorial misconduct in the State's closing argument.

{¶ 132} First, Wright asserts that there was a "significant shortfall" in the touch DNA evidence, because K.W. testified that Wright had "rubbed his penis on her vagina through her underwear for five minutes," but Wright's DNA was only found on the waistband of the underwear, not the front crotch area. The prosecutor argued as follows regarding the touch DNA that Barger, the Miami Valley Regional Crime Lab scientist, found on K.W.'s underwear:

* * * Barger testified to a reasonable degree of scientific certainty that this was unexpected in terms of touch DNA. She was basically taken aback when she found this amount of touch DNA on the under garment. When you look at these underwear they're more like bikini; they're low cut. She said she swabbed the waistband in the front and the waistband in the back and considered what [K.W.] said. [Barger] testified to a reasonable degree of scientific certainty that it would also have to come from vigorous rubbing and we know where that came from. [K.W.] described it and what happens, what she described happens, when you have a grown man like the Defendant on top of this little girl moving an erect penis back and forth on her under garment, it's not going to be just limited to the crotch area, as

it were.   It's going to all up and down the front.   No doubt about it.
According to Wright, the prosecutor's statements implied that DNA evidence was found on the crotch *and* waistband of the underwear, which was a misrepresentation of the evidence.

{¶ 133} The State responds that the evidence was very clear that the DNA expert had only swabbed the waistband on the front and back, not the crotch area of the undergarment in question.   According to the State, Wright's suggestion that, "just two sentences later, the State was misleading the jury by misstating the evidence, is absurd." Rather, the State asserts that it was attempting to "impress upon the jury" that it was unsurprising that the DNA was found on the waistband in light of the "mechanics of what had happened according to [K.W.'s] testimony."   The State also asserts that "common sense dictates that DNA will not be found in a location that was not swabbed," and it was clear that the crotch had not been swabbed.

{¶ 134} Wright did not object during the State's closing argument, and we cannot conclude that plain error is demonstrated.

> We have recognized that "improper prosecutorial comments amount to misconduct only if they prejudicially affected the substantial rights of the accused." *State v. Ward*, 2d Dist. Montgomery No. 18211, 2001 WL 220244, *10-11 (Mar. 2, 2001).   When conducting the analysis, the reviewing court should "focus on the fairness of the trial, not the culpability of the prosecutor." *State v. Reed*, 2d Dist. Montgomery Nos. 18417 & 18448, 2001 WL 815026, *2 (July 20, 2001).   When the alleged misconduct

takes place during the State's closing argument, the appellate court should consider the effect that "the misconduct had on the jury in the context of the entire trial." *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993).

Prosecutors are entitled to considerable latitude in opening statement and closing argument. *State v. Ballew*, 76 Ohio St.3d 244, 255, 667 N.E.2d 369 (1996). In closing arguments, the State may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). *See also* Speigelman, *Prosecutorial Misconduct in Closing Argument: The Role of Intent in Appellate Rev.*, 1 J. App. Prac. & Process 115, 134 (1999) ("The standard for proper closing arguments begins with the concept that they are opportunities for the parties to present their view of the proper inferences to be drawn from the evidence presented."); Am. Bar Assn. Standards for Criminal Justice 3-5.8, cmt. at 107 (1993) ("The most elementary rule governing the limits of argument is that it must be confined to the record evidence and inferences that can reasonably be drawn from it.").

Prosecutorial misconduct only constitutes reversible error in rare instances. *Keenan* at 405. Accordingly, a reversal for prosecutorial misconduct will only occur if it is clear that the trial's outcome would have been different if not for the misconduct. *State v. Smith*, 14 Ohio St.3d 13,

15, 470 N.E.2d 883 (1984).

*State v. James*, 2d Dist. Montgomery No. 28892, 2021-Ohio-1112, ¶ 28-30.

**{¶ 135}** Further:

> The Ohio Supreme Court has said that attorneys may not properly express their personal beliefs about the credibility of witnesses or the guilt of an accused. See, e.g., *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 24, 514 N.E.2d 394. However, it is well established that "[w]hile it is improper for the prosecutor to express to the jury his or her personal opinion about the credibility of any witness, the prosecutor is permitted to make fair comment on the credibility of witnesses based upon their testimony in open court." *State v. Mundy* (1994), 99 Ohio App.3d 275, 304, 650 N.E.2d 502, citing *State v. Price* (1979), 60 Ohio St.2d 136, 140, 398 N.E.2d 772, 14 O.O.3d 379, 381.

*State v. Coben*, 2d Dist. Greene No. 2001-CA-8, 2002 WL 313133, *2 (Mar. 1, 2002).

**{¶ 136}** We cannot conclude that the prosecutor's arguments regarding the touch DNA on K.W.'s underwear rose to the level of prosecutorial misconduct. Barger testified that she swabbed the "top portion of the waistband" of K.W.'s underwear, and that the amount of DNA retrieved from the area was significant to her. She stated that the "more vigorous the contact and the more rubbing that you were to have, you would pick up more DNA from that." K.W. testified that while Wright was naked, he "was like moving back and forth on top of me." She stated that after five minutes Wright "took my underwear off." We conclude that this portion of the closing argument was confined to the record

evidence and inferences that could reasonably be drawn from it.

{¶ 137} Next, Wright asserts that another "key exculpatory fact" at trial was that there were no eyewitnesses to any of the alleged repeated, ongoing abuse. According to Wright, the prosecutor sought to explain this by speculating that, because Wright was a police officer, he had "some unique ability to conceal his misdeeds." Wright directs our attention to the following argument by the prosecutor:

> * * * I think it's very important that you notice the conversation I had with [Wright] during cross-examination, he's a police officer, and the fact of the matter is, and the same goes for prosecutors and criminal defense attorneys, people that know the law, they're taught how to build a case. They know what's good evidence; they know what's bad evidence and to break it all down and just put it out there, a police officer is in a pristine position that he or she decides if they want to break the law they can do it better than anyone else because they know what it takes to make a case and they know what it takes to break a case. That's something that should be considered.

{¶ 138} The State responds that "[e]verything argued by the State at this point in time was based upon evidence that came through [Wright's] own testimony." We agree with the State. On cross-examination, Wright discussed his training, education, and experience as a police officer, and his ability to investigate cases and to evaluate evidence. Thus, this portion of the State's argument was confined to the record evidence and inferences that could reasonably be drawn from it.

{¶ 139} Third, Wright argues that the prosecutor urged sympathy for K.W., directing our attention to the following portion of closing argument:

> * * * [C]onsider through her testimony everything that this child lost in coming forward and saying I want it to stop. The only thing she gained was that she's no longer being sexually abused. Through her testimony we know for a fact that she was taken out of her school. The only school she's ever really known; overnight. Taken away from her life; her friends; her teachers; her extracurricular activities; thrown into a strange school where she knew no one. She lost her mother, obviously as you can tell from the testimony. She has gone nearly a year and half with virtually no contact with her two brothers and her little sister and she testified that she was basically a built in babysitter. * * * She gave up her life. Right now she's living in foster care. Why would she do that?

Wright asserts that none of these comments "served any legitimate purpose"; they were "all designed to garner sympathy" for K.W., independent of the evidence.

{¶ 140} As set forth above, K.W. testified that she went to live with her grandmother for a year after she disclosed the abuse; she attended a different school during that time. She testified that she then lived with a friend's family. It was clear from the evidence that she had not resided with her mother or siblings since she disclosed the abuse. K.W. also testified that she had had five months of counseling. Based on tis evidence, we conclude that the prosecutor's comments in this section were confined to the evidence in the record and the reasonable inferences that could be drawn therefrom.

{¶ 141} Wright asserts that the prosecutor next offered his own opinion on K.W.'s credibility by stating in closing argument: "The victim in this case has no motivation whatsoever to come in here and do anything other than to tell the truth. This court room is a very intimidating environment and it's meant to be so. How much more so to a 13 year old child? Think about what she had to come in here and testify to; embarrassing things."

{¶ 142} As noted above, Wright's theory was that K.W. was motivated to lie to avoid his discipline and live with her grandmother. Viewing the quoted statements in the context of the entire trial, we see no prejudicial effect.

{¶ 143} Finally, Wright asserts that the State's closing argument "culminated with an emotional and impassioned speech about child victims and nightmares." Wright directs our attention to the very end of the State's closing argument: "[K.W.'s] nightmare was real and there was indeed a monster, but he wasn't under the bed, he was in the bed and sadly, as this case has shown us in no uncertain terms, sometimes that monster wears a uniform and a badge." According to Wright, this argument abandoned any effort to conceal ill intent, because it did not refer to any facts, evidence, or legal instruction; the "only purpose [was] to incite and inflame personal prejudice against [Wright] and garner sympathy [for] [K.W.]."

{¶ 144} The State concedes that referring to Wright as a monster "took closing remarks to a level that was too personal." However, it argues that the rest of the cited statement was based upon facts and evidence the jury had heard during the course of the trial, because the abuse "took place repeatedly in the child's bed." Moreover, the

State argues that the comment concerning the word monster did not rise to the level of inflaming the jury, thereby causing it to convict out of passion, because the jury was told on more than one occasion that the closing arguments of counsel were not evidence that could be considered in determining guilt or innocence. The State also notes that the jury deliberated for seven hours which belies any argument that the verdict was reached in "the heat of passion." The State points out that this was not a case based only on the word of the accuser against the word of the accused and that the DNA evidence was "powerful evidence" against Wright, making it "less likely" that the State's reference to Wright as a monster impacted the verdict.

{¶ 145} We conclude that the matters herein are distinguishable from *State v. Willard*, 144 Ohio App.3d 767, 761 N.E.2d 688 (10th Dist.2001). In *Willard*, the defendant argued that he had been denied a fair trial due to multiple instances of prosecutorial misconduct during the State's closing argument. First, the prosecutor stated, "Defense also wants you to believe that [the victim is] not only a liar, but a really good one. She's sophisticated enough to pull off a lie, is able to fool individuals who are trained to investigate these type of things, social workers, detectives." *Id*. at *773. Defense counsel objected, asserting that there had been no testimony by social workers, and the court sustained the objection. *Id*. "Second, defendant argue[d] that the prosecutor improperly commented on defendant's physical appearance when he pointed to defendant and told the jury that, 'as we stand here right now, this is what a man who rapes his daughter looks like. This man is guilty.' " *Id*.

{¶ 146} Willard next argued that the prosecutor had improperly attempted to play

to the emotions of the jury when he indicated that defense counsel "had embarrassed and belittled the alleged victim" during cross-examination; specifically, the prosecutor stated that the victim had " 'had to come in and explain to a courtroom full of strangers the most degrading, dehumanizing acts that a person could suffer.' " *Id.* at 773-74. The prosecutor further stated, "She goes through all this, and then she has to sit and undergo and endure cross-examination at the hands of her assailant's attorney. Does anybody think that this has been fun?' " *Id.* at 774.

**{¶ 147}** The Tenth District agreed with Willard that the prosecutor had engaged in prejudicial misconduct:

Even though we find the above comments by the prosecutor to have been improper, we must still determine whether such remarks were so prejudicial as to deny defendant a fair trial. *Freeman*, [138 Ohio App.3d 408, 419, 741 N.E.2d 566 (2000)]. Further, the improper conduct must be assessed in the context of the entire case, and a reviewing court "must also consider the cumulative effect of improper comments, because '[e]rrors that are separately harmless may, when considered together, violate a person's right to a fair trial.' " *Id.* at 420, 741 N.E.2d at 574.

Although, when viewed alone, any single remark may not be enough to require reversal, we conclude that the cumulative effect of the prosecutor's improper statements in the present case denied defendant a fair trial. Here, the evidence of defendant's guilt was not overwhelming. Specifically, there was no corroborating physical evidence as to [the

victim's] claim of sexual abuse and, despite the fact that approximately one thousand alleged incidents took place over a time period in which other family members were living in the same household, there were no other witnesses who corroborated the victim's story. Thus, the determinative issue for the trier of fact was the truthfulness and credibility of [the victim], and the prosecutor's improper comments touched on credibility issues.

*Id*. at 776.

**{¶ 148}** Unlike in *Willard*, we cannot conclude that the prosecutor's characterizations of Wright deprived him of a fair trial or that the outcome of the trial would have been different in the absence of the prosecutor's improper "monster" analogy when considered in the context of the entire trial, and even considering the cumulative effect of the prosecutor's remarks.

**{¶ 149}** Wright's fourth assignment of error is overruled.

**{¶ 150}** Wright's fifth assignment of error is as follows:

THE TRIAL COURT IMPROPERLY EXCLUDED PORTIONS OF DEFENSE EXPERT TESTIMONY IN VIOLATION OF THE RULES OF EVIDENCE AND APPELLANT'S RIGHTS TO COMPULSORY PROCESS AND TO PRESENT A MEANINGFUL DEFENSE IN VIOLATION OF THE SIXTH AMENDMENT AND DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

{¶ 151} Wright directs our attention to Dr. Holland's conclusion that there was "no compelling evidence" that any vaginal penetration had occurred and to Holland's cross-examination. According to Wright, the point of the cross-examination was "to narrow the focus only to K.W.'s exam on December 10, 2019," and "looked at from that perspective (and taken in conjunction with Liker's opinions), there was a better explanation for a normal exam."

{¶ 152} Wright argues that Holland sought to explain how he reached his conclusion, despite his concession that lack of injury did not necessarily rule out abuse; the trial court sustained the prosecutor's objection and precluded Holland's explanation. Wright argues that this decision was erroneous. According to Wright, Holland was attempting to explain that his conclusions were not, and medically should not have been, based solely on the single exam of December 10, 2021. Wright argues that K.W.'s "normal exam, when considered in conjunction with alleged history of penetrative abuse over two years, did not support her contention of penetration." He asserts that Holland's testimony, which was essential to explain the foundation of his opinion and his answers on cross-examination, should have been allowed, and that he (Wright) had a constitutional right to present it. Wright asserts that, by prohibiting Holland for "offering key context to his conclusions," the court left the jury with the erroneous impression that Holland's reasoning was flawed, and the State capitalized on this in closing argument.

{¶ 153} The State responds that Wright's claim is based in large part on what he believes the expert would have said had there not been an objection. The State asserts that Holland answered the question asked by defense counsel "in the first sentence" of

his response, and then continued "at length" in an "unresponsive" and "narrative" way, which was "objectionable on both fronts." The State directs our attention to Holland's final remark, which was that this case was not based on a medical examination and "should be based on all the information you guys is receiving." The State argues that Holland "had said all of the things that [Wright] claims he was prevented from saying during direct examination and immediately after the above excerpt from his re-direct examination." The State also asserts that Holland had reaffirmed his position that his opinion was not based on a single medical exam but rather K.W.'s reported history of abuse, and that "Holland did in fact give an opinion stating that, based upon the history given the victim, he would expect to find an abnormal exam." According to the State, after the objection at issue, Holland "doubled down" on this initial opinion.

{¶ 154} As noted by the Ohio Supreme Court:

In *Chambers v. Mississippi* (1973), 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297, the court recognized that "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Although *Chambers* referred to due process, the court has since explained that "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " (Citations omitted.) *Crane v. Kentucky* (1986), 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636, quoting

*California v. Trombetta* (1984), 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413, and citing *Chambers* * * * and *Washington v. Texas* (1967), 388 U.S. 14, 23, 87 S.Ct. 1920, 18 L.Ed.2d 1019. As stated in *Crane,* "That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence * * * when such evidence is central to the defendant's claim of innocence." [*Crane*,] 476 U.S. at 690, 106 S.Ct. 2142, 90 L.Ed.2d 636.

*State v. Swann*, 119 Ohio St.3d 552, 2008-Ohio-4836, 895 N.E.2d 821, ¶ 12.

{¶ 155} Having reviewed the entirety of Holland's testimony, we disagree with Wright that the trial court prohibited Holland from "offering key context to his conclusions" such that Wright was denied a meaningful opportunity to present a complete defense. As noted above, according to Wright, Holland "was attempting to explain that his conclusions were not * * * based only on the single exam of December 10, 2021," because K.W.'s normal exam, when considered along with her reported history of abuse over a two year period, did not support her allegation of penetration. Holland's testimony reflects that he made that point repeatedly. When asked on direct examination what he learned from the interviews, Holland stated that K.W.'s assertion that the abuse began two years before the exam and happened multiple times, with allegations of digital and penile penetration, was very significant to him. He stressed that the medical exam is *part* of the evidence, that it cannot be relied upon in isolation, and that he believed that at the onset of abuse, K.W.'s "vagina would have been very thin and the hymen would have been * * * non-stretchable." Holland stated that, based upon the age of onset of the

abuse two years prior to the exam, he would have expected an abnormal exam.

{¶ 156} In the course of the redirect examination at issue, Holland was merely asked about the meaning of a normal exam, and in the course of his response, he repeated his previous assertion that the medical exam should not be viewed in isolation, but that the "case should be based on all the information you guys is receiving," such as K.W.'s allegation in her interviews that the onset of abuse was two years earlier. The State likely objected because the question asked by defense counsel was limited in scope to the meaning of "a normal exam" and nothing further. In our view, it is speculative for defense to assume, based upon the State's objection, that Holland had not completed his answer, and we find no basis to conclude that he was prevented from presenting a complete defense.

{¶ 157} Wright's fifth assignment of error is overruled.

{¶ 158} Wright's sixth assignment of error states:

THE TRIAL COURT IMPROPERLY INSTRUCTED THE JURY ON THE DEFINITIONS OF "SEXUAL CONDUCT," "PENETRATION," AND "VAGINAL INTERCOURSE," THEREBY COMMITTING PLAIN ERROR AND DEPRIVING APPELLANT OF HIS RIGHT TO TRIAL BY JURY AND RELIEVING THE STATE OF ITS BURDEN OF PROOF BEYOND A REASONABLE DOUBT IN VIOLATION OF THE SIXTH AMENDMENT AND DUE PROCESS OF LAW, AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO

CONSTITUTION.

**{¶ 159}** The court instructed the jury as follows without objection:

* * * Sexual conduct means vaginal intercourse between a male and a female; fellatio or cunnilingus; or without privilege to do so, the insertion, however slight, of any part of the body, instrument, apparatus or object into the vaginal opening of another. Penetration, however slight, is sufficient to complete vaginal intercourse. Vaginal intercourse means penetration of the penis into the vagina. Evidence that the hymen is intact is not necessarily evidence that penetration did not occur. If an object is introduced with sufficient force to cause the labia majora to spread, penetration has occurred. * * *

**{¶ 160}** Wright acknowledges that the jury instructions on "sexual conduct" and "vaginal intercourse" generally matched the model Ohio Jury Instructions and the statutory definitions in R.C. 2907.01(A). However, he argues that the trial court added the following improper language: "If an object is introduced with sufficient force to cause the labia majora to spread, penetration has occurred." Wright also argues that the statutory definition has never included any reference to the hymen or labia majora to define penetration and that this "extra language" altered and confused the statutory definitions by adding "undefined, confusing surplusage." He also asserts that the experts who testified at trial discussed the hymen and labia only in generalized terms, not in relation to any medical exam of K.W., and K.W. also did not mentioned anything specific to make this extra language relevant. Wright asserts that although he failed to object,

plain error is demonstrated, because the "instruction created an unconstitutionally vague and overbroad definition of 'penetration' and 'vaginal intercourse,' thereby relieving the State of its burden of proving these elements beyond a reasonable doubt."

{¶ 161} In response, the State asserts that this court has found sexual penetration, as defined by R.C. 2907.01(A), to include spreading of the labia, and that the language added to the jury instructions in this case was neither improper nor likely to mislead the jury.

{¶ 162} As this Court has noted:

" 'The jury instructions given by a trial court must be a correct, clear, and complete statement of the law applicable to the case.' " *McBride v. Quebe,* Montgomery App. No. 21310, 2006-Ohio-5128, ¶ 50, quoting *Roberts v. State Farm Mut. Auto. Ins. Co.,* 155 Ohio App.3d 535, 2003-Ohio-5398, 802 N.E.2d 157, at ¶ 48. "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30(A). Failure to object waives all but plain error. *McBride.* Plain error exists "if the trial outcome would clearly have been different, absent the alleged error in the trial court proceedings." *State v. Rollins,* Clark App. No. 2005-CA-10, 2006-Ohio-5399. "[T]o successfully prevail under plain error the substantial rights of the accused must be so adversely affected that the error undermines the 'fairness of the guilt determining process.' " *State v.*

*Ohl* (Nov. 27, 1991), Ashland App. No. CA-976, 1991 WL 274508, quoting

*State v. Gideons* (1977) 52 Ohio App.2d 70, 6 O.O.3d 50, 368 N.E.2d 67.

*State v. Thomas*, 170 Ohio App.3d 727, 2007-Ohio-1344, 868 N.E.2d 1061, ¶ 15 (2d Dist. 2007).

**{¶ 163}** R.C. 2907.01(A) provides:

"Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

**{¶ 164}** As the State asserts, this Court has held as follows regarding vaginal rape:

There must be some evidence, direct or circumstantial, that the accused penetrated, however slightly, the victim's vagina with an object. *It is sufficient if the evidence shows that the force of the object caused the outer lips of the victim's vagina, the labia, to spread.* The evidence is insufficient to prove sexual conduct and vaginal rape as a result if the evidence shows only that the defendant made contact with the labia and no spreading occurred.

(Emphasis added.) *State v. Lucas*, 2d Dist. Montgomery No. 18644, 2001 WL 1103288, *3 (Sept. 12, 2001).

**{¶ 165}** The portion of the instructions to which Wright objects is as follows:

"Evidence that the hymen is intact is not necessarily evidence that penetration did not occur. If an object is introduced with sufficient force to cause the labia majora to spread, penetration has occurred. * * *" We conclude that the second sentence of the court's instruction to which Wright objects is a clear statement of the law. Regarding the first sentence, the jury heard much testimony about the nature of the hymen. Even if we were to conclude that that portion of the instruction was improper, we cannot conclude that plain error is demonstrated. The jury heard from Dr. Liker, an expert in child sexual abuse, that a normal exam does not "refute a history of sexual abuse," that a normal exam is consistent with a history of sexual abuse, and that "the majority of children who are sexually abused have normal exams." The jury also heard Wright's expert, Dr. Holland, testify that a normal exam "does not rule out sexual abuse or any form of penetration but it also does not mean it occurred." We cannot conclude that, in the absence of the trial court's instruction regarding the hymen, the jury would have found Wright not guilty, such that the fairness of the trial was undermined.

{¶ 166} Wright's sixth assignment of error is overruled.

{¶ 167} Wright's seventh assignment of error is as follows:

TRIAL COUNSEL WAS INEFFECTIVE BY FAILING TO CONSULT WITH AND CALL EXPERT WITNESSES, FAILING TO OBJECT TO INADMISSIBLE TESTIMONY AND ARGUMENT, AND BY EMPLOYING DEFICIENT TRIAL STRATEGY. THIS DEPRIVED APPELLANT OF DUE PROCESS OF LAW AND EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH

AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

**{¶ 168}** Wright asserts that defense counsel failed to object to "inadmissible corroborative hearsay," failed to object to or challenge the foundation of medical and psychological experts, and made decisions at trial that did not fit within any coherent strategy. Wright asserts that defense counsel "underestimated the nature of the case, the impact of the State's experts, and the dangerous consequence of permitting even the slightest improper corroboration of K.W.'s credibility."

**{¶ 169}** Wright asserts that counsel's failures, individually and collectively, prejudiced him by directly and/or indirectly bolstering K.W.'s credibility, and therefore counsel acted ineffectively.

**{¶ 170}** Regarding defense counsel's failure to challenge the testimony of Drs. Miceli and Liker, Wright asserts that neither of them had conducted an independent examination of K.W., and they were called only to provide background information to support K.W.'s credibility; he asserts that defense counsel should have challenged the admissibility of their testimony under *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Wright argues that defense counsel also should have objected to the admissibility of their respective reports at trial as inadmissible hearsay that "served only to-restate the opinions of the experts in written form." According to Wright, expert medical, psychological, and DNA testimony "formed the backbone of the State's case," and defense counsel failed to consult with and call experts to refute, impeach, or otherwise explain the State's scientific evidence. Wright asserts

that defense counsel's cross-examinations were "rudimentary" and demonstrated a lack of fundamental knowledge and preparedness to combat the State's experts.

**{¶ 171}** Regarding Dr. Miceli, Wright argues that defense counsel relied "on his own ability to impeach [her] and extract opinions favorable to the defense," but he ended up simply repeating, and thus reiterating, Miceli's testimony on direct examination, without challenging the bases for her opinions. According to Wright, while Miceli admitted that false allegations of abuse can occur, "she was quick to add that they happen less often" and made it clear that "she was not going to indulge such a discussion," and counsel did not explore false allegations in any depth. Wright argues that defense counsel's strategy to use Miceli as a defense expert "failed *ab initio*" because detailed preparation with the assistance of a qualified expert in the area of child psychology and false allegations of sexual abuse was required. He argues that Miceli's testimony was "largely unchallenged and resulted in significant damage," because they excused the primary concerns about K.W.'s credibility – lack of detail, delayed disclosure, behavioral problems, etc.

**{¶ 172}** Regarding Dr. Barger's testimony, Wright asserts that defense counsel had no effective strategy to deal with the DNA evidence, because there was no defense expert at trial and "it was apparent that Counsel failed to consult with one prior to trial." He points out that Barger's report suggested that Wright's male relative should be tested but the State did not do so, and defense counsel failed to challenge the "origin of the alleged DNA" found on K.W.'s waistband and the general assertions that it would have been deposited there by a "fair amount of rubbing." Wright asserts that counsel did not request "detailed and complete DNA lab testing records," testing of other male relatives,

or independent testing of any of the items taken from the home. According to Wright, an expert could have confirmed that the presence of touch DNA does not require a lot of cells and that detailed lab reports could have refuted Barger's "vague assertions" about the amount of DNA present. Wright argues that since the DNA evidence was the only physical evidence in the case, it should have been the primary focus of the defense.

{¶ 173} The State responds that the issues discussed in the first six assignments of error have already addressed many of Wright's arguments under this assignment. The State also asserts that there is no evidence in the record to substantiate Wright's claims that defense counsel did not consult with or make efforts to secure a DNA expert, a medical doctor other than Dr. Holland, or a forensic child psychologist. The State contends that Wright essentially concedes this point in a footnote, commenting that this argument is an effort to preserve the record "for a potential post-conviction relief argument at a later date."[2]

{¶ 174} The State argues that Wright's assertion that defense counsel was unprepared for cross-examination of the State's expert witnesses is "an unfair and self-serving assessment." The State points out that Miceli was asked many questions to demonstrate that she was not there to say the child was telling the truth, and she conceded that children do lie for a variety of reasons; Miceli admitted having no

---

[2] Footnote 9 of Wright's brief states that he recognizes that his claims of ineffective assistance of counsel regarding Liker and Miceli, counsel's failure to consult with and /or call a DNA expert, and the choice to call Holland (and not someone more qualified) "may well require" evidence that is outside the record and would have to be considered in post-conviction proceedings. "He nonetheless raises them here to the extent the record reflects the outcome of these decisions, if not the basis. These claims otherwise [may] be deemed defaulted and/or *res judicata* upon later review."

knowledge of the specific facts of this case. According to the State, defense counsel made critical points with a few pointed questions then chose to end his questioning, which was a strategic decision and de-emphasized the importance of the testimony to the jury; it was not incompetence.

{¶ 175} Similarly, the State argues that the cross-examination of the DNA expert Barger was extensive, covered a wide variety of facts contained in the DNA report, and "constituted a definite and calculated strategy which was effective in getting facts favorable to [Wright] out in the open," including the facts that some items were not tested, that no a DNA standard was provided for Wright's infant son, that touch DNA gives less definitive results than DNA from other sources, and that "the probability numbers provided in the report were neither impressive nor telling in terms of guilt."

{¶ 176} As this Court has noted:

In order to prevail on a claim of ineffective assistance of counsel, a defendant must show both deficient performance and resulting prejudice. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), paragraph two of the syllabus; *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. Two elements must be demonstrated: 1) that counsel's representation fell below an objective standard of reasonableness; and 2) that counsel's errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the proceeding would have been different. *Id.* In our review of an ineffective assistance of counsel claim, "we will not second-guess trial

strategy decisions, and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' "  *State v. English,* 2d Dist. Montgomery No. 26337, 2015-Ohio-1665, ¶ 10, quoting *State v. Mason,* 82 Ohio St.3d 144, 157-158, 694 N.E.2d 932 (1998).

*State v. Hartman*, 2016-Ohio-2883, 64 N.E.3d 519, ¶ 45 (2d Dist.).

**{¶ 177}** This Court further noted in *Hartman* that " '[h]indsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel.' "   (Citations omitted.)   *Id.* at ¶ 46.

We have held that "trial counsel's decision to cross-examine a witness and the extent of such cross-examination are tactical matters." *State v. Russell,* 2d Dist. Montgomery No. 21458, 2007-Ohio-137, ¶ 55.  "A reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy."  *State v. Conley,* 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56 (2d Dist.), citing *State v. Smith,* 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985).  "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available."  *Id.,* citing *State v. Cook,* 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992).

*Id.* at ¶ 48.

**{¶ 178}**  The failure to call an expert and instead rely on cross-examination does

not constitute ineffective assistance of counsel. *State v. Nicholas*, 66 Ohio St.3d 431, 436, 613 N.E.2d 225 (1993), citing *State v. Thompson*, 33 Ohio St.3d 1, 10-11, 514 N.E.2d 407 (1987). *See also State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 66.

{¶ 179} " 'A *Daubert* hearing is a prospective examination of the admissibility of expert opinion to determine whether the basis for the testimony is scientifically valid and reliable.' *State v. Heisey,* 2015-Ohio-4610, 48 N.E.3d 157, ¶ 39 (2d Dist.)." *State v. Boehme,* 2d Dist. Montgomery No. 27255, 2017-Ohio-8246, ¶ 11, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). We conclude that any suggestion that a *Daubert* challenge to Miceli's or Barger's testimony would have been effective is speculative.

{¶ 180} Moreover, ineffective assistance of counsel is not demonstrated, and we cannot conclude that defense counsel allowed Miceli and Barger to improperly bolster K.W.'s credibility. Miceli's testimony was offered to explain to the jury the dynamics of child sexual abuse in general. As to defense counsel's cross-examination of Miceli, we will not second-guess defense counsel's trial strategy. While defense counsel's cross-examination was relatively brief, we cannot conclude that defense counsel was ineffective in failing to further explore the possibility of false allegations of child sexual abuse, given that the jury had just heard from Barger that Wright's DNA was found on K.W.'s underwear. Defense counsel may have made a tactical decision to minimize his cross-examination of her. Regarding Wright's assertion that Miceli's opinion excused any concerns about K.W.'s credibility, we again note that Miceli was speaking in general terms

and not about K.W. in particular; defense counsel clarified that Miceli had never met K.W. nor reviewed her records. In defense counsel's cross-examination of Miceli, he emphasized the inconsistent characteristics of child abuse victims in terms of their reactions to abuse and their memory, and Miceli acknowledged that neither of these characteristics was necessarily probative of abuse.

{¶ 181} Regarding Barger, Wright mischaracterizes the record when he asserts that Barger's report suggested that Wright's male relatives should have been tested. Barger testified that the statement at issue in her report "is a standard statement that goes into every single DNA report." Moreover, the record does not establish that defense counsel failed to consult with any experts outside of trial. Defense counsel's cross-examination of Barger was thorough; he questioned her about different sources of DNA and their relative reliability, the lack of DNA on Wright's sweatpants, the process by which touch DNA is deposited, and the conclusions reached in her report. We cannot conclude, as Wright suggests, that the significance of the DNA evidence was not appreciated by defense counsel. Based upon the foregoing, we cannot conclude that defense counsel's conduct was deficient or that Wright was prejudiced.

{¶ 182} Wright next asserts that the admission of K.W.'s medical records was a "strategic disaster" because the records "contained multiple layers of hearsay that corroborated K.W.'s trial testimony"; he contends that, in the absence proper authentication and foundation, the records were inadmissible. According to Wright, if defense counsel's purpose was to establish that K.W. had no physical injuries, a complete set of records was not required to do so, and defense counsel should have "redacted the

corroborating hearsay" instead of giving the jury "full access" to K.W.'s "inadmissible prior consistent statements."

{¶ 183} Finally, Wright argues that the medical records "remedied an otherwise fatal evidentiary problem concerning the admissibility of Liker's opinions." He argues that, because Liker's opinion was based solely on her experience, training, and review of the medical records, her opinions "were neither relevant nor admissible" unless the records were also admitted in evidence pursuant to Evid.R. 703. According to Wright, although Liker identified the records, the State did not admit them, and it could not have done so anyway because it did not have "an authenticating foundational witness" to identify them and address the hearsay issues. Because Liker's opinions were "critical" to the State's case, Wright asserts that counsel caused "unmeasurable" damage, because Liker's opinion refuted Holland's testimony, explained how and why there were no physical findings, and filled "a substantial void in K.W.'s version of events."

{¶ 184} The State responds that Liker's testimony was not hearsay except possibly for her answer to the question whether she agreed with the conclusion in the medical report that K.W.'s exam was "normal essentially"; she answered affirmatively. The State asserts that the remainder of Liker's testimony was related to the report that she submitted, which was entered into evidence by the State. According to the State, insofar as any statement by K.W. was contained in the report, this was "a prior consistent statement and not impermissible hearsay once the records were entered; "deciding not to redact that portion of the records can easily be recognized as a type of trial strategy." The State contends that the records corroborated Dr. Holland's testimony, the exam was

inconsistent with the history given, and K.W.'s statement, "when read in its entirety, necessarily eludes to the history to which she gave others and the history that Holland refers to in his testimony."   The State asserts that there is no merit to Wright's claim that submission of the records into evidence was ineffective or harmful to his position.

{¶ 185} The record reflects that the medical report (Exhibit B), was admitted at the conclusion of the trial, after the following exchange:

JUDGE:   [Defense counsel], do you have any exhibits to move into evidence?

[DEFENSE COUNSEL]: Yes, you Honor.   Exhibit A, the Crime Lab Reports, Exhibit B, the medical exam; Exhibit C is already in.

JUDGE:   What is C that you say is already in?

[PROSECUTOR]:   Dr. Liker's report.

[PROSECUTOR]:   This says B is a report from the hospital.   That wasn't provided to your doctor.

[DEFENSE COUNSEL]:   But, your doctor, Dr. Liker, stated she knew it.

[PROSECUTOR]:   Relied upon it?

[DEFENSE COUNSEL]:   Yeah and she authenticated it.

JUDGE:   I had Liker testif[y] to Exhibit B.

{¶ 186} Evid.R. 703 provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing."

{¶ 187} We conclude that ineffective assistance of counsel is not demonstrated. We agree with the State that if defense counsel had redacted certain portions of the records, the jurors may have wondered if defense counsel was concealing relevant evidence from them. Further, the attending physician's finding of a normal exam supported Holland's testimony and Wright's position that the abuse never occurred, and submitting the records was a matter of trial strategy that we will not second guess. Even if we were to conclude that counsel was somehow ineffective in submitting the records and K.W.'s prior consistent statements, we cannot conclude that prejudice is demonstrated.

{¶ 188} Wright next argues that defense counsel's "decision to use Dr. Holland * * * fell short of effective assistance of counsel," since Holland was not an expert in forensic medicine and had no formal training in child sex abuse. According to Wright, Holland also had an inherent and apparent bias insofar as he was a client of defense counsel's law firm. Wright further asserts that, regardless of Holland's credentials, defense counsel failed to provide him with all the records necessary to support his testimony; Holland had reviewed three videos of K.W. and a PDF of Dr. Liker's "interpretation" of the report of K.W.'s exam at Dayton Children's Hospital, but "[e]mbarrassingly," Holland learned for the first time on cross-examination that there had been other reports he had not reviewed, as well as "critical information about the onset of [K.W.'s] menstrual cycle." According to Wright, all of this information was available to counsel prior to trial and should have been made available to Holland in preparation for his testimony.

{¶ 189} Wright also asserts that defense counsel's direct examination of Holland "was confusing and ineffective" and that Holland's testimony was "confusing, disjointed, and circular" while also failing to "highlight the key" to Holland's opinion – the timeline provided by K.W. According to Wright, K.W. had described pain from the digital and penile penetration over the two-year period, and he cites Holland's testimony that a "cleft" or a "trans-section" to the hymen would not heal on its own. Wright argues that "if the allegations were true, [Holland] would expect to see evidence of this at the time of her exam on December 10, 2019," but that "the actual testimony fell far short of clarifying Holland's reasoning. It lacked necessary organization and preparation."

{¶ 190} The State points out that Holland testified that his prior relationship with defense counsel would not affect his ability to be fair and objective. The State also argues that Wright's characterization of defense counsel's performance on direct examination is belied by the record: Holland's direct examination made clear his position that if K.W. had been abused repeatedly over the years and at the ages she had claimed, there would have been an abnormal exam.

{¶ 191} We agree with the State that ineffective assistance of counsel is not demonstrated. Defense counsel clearly adduced Holland's opinion to a reasonable degree of medical certainty on direct examination that there was no "compelling evidence" that any vaginal penetration had occurred to K.W. and that, based upon what she described and the age of onset of abuse, Holland would have expected to see an abnormal exam in a majority of patients. Even if we were to conclude (which we do not) that defense counsel's performance was deficient based upon counsel's failure to provide

the hospital records to Holland, prejudice is not demonstrated. In other words, we cannot conclude that had defense counsel provided the hospital records to Holland, the jury would have found Wright not guilty.

{¶ 192} Wright next argues that defense counsel was ineffective in failing to object to Mercedes's "hearsay testimony" and then reiterating and clarifying it on cross-examination. Wright asserts that defense counsel had Mercedes repeat everything K.W. told her, including the hearsay, and then clarified that the conversation related to sexual abuse. Defense counsel also established that Mercedes's testimony had been consistent with her prior statements to the police.

{¶ 193} The State responds that Wright's characterization of Mercedes's cross-examination is "a very contorted reading and interpretation." The State asserts that, although defense counsel had Mercedes repeat her statement to law enforcement, it was obviously to demonstrate several things that arguably damaged her credibility. According to the State, when viewed in context, this questioning was an example of effective cross-examination.

{¶ 194} Again, we agree with the State that ineffective assistance of counsel is not demonstrated. Wright mischaracterizes defense counsel's cross-examination of Mercedes. Defense counsel emphasized that K.W.'s friendship with Mercedes had been of short duration at time of the disclosure, that Mercedes had told Cooper that she and K.W. were not close and that K.W. had never confided in her before, that Mercedes had never been invited to K.W.'s home and did not have her phone number, and that K.W. had not disclosed the sexual nature of Wright's conduct. We conclude that it could have

been a matter of sound trial strategy for defense counsel to impugn K.W.'s testimony that she had confided in a very close friend and to highlight K.W.'s testimony that she did not disclose sexual abuse to Mercedes, perhaps suggesting that it did not occur. In the absence of deficient performance, prejudice is not demonstrated.

{¶ 195} Finally, Wright cites Det. Cooper's testimony that he downloaded the contents of Wright's cell phone, asserting that if defense counsel "had not opted to probe the matter" on cross-examination, "there would have been no more discussion about it." He notes that defense counsel instead asked Cooper if he found any of the pornography referenced by K.W. on Wright's phone, which "opened the door for redirect," where Cooper testified that "approximately 150 unidentified videos" had been deleted from the phone. Wright asserts that on re-cross, defense counsel tried to show that Wright had turned over the phone on December 10 during the first interview, apparently to show his cooperation, but Cooper reminded counsel that he (Cooper) had received the phone on December 12, 2019. Wright argues that, while defense counsel sought to show that Wright had been cooperative and had nothing to hide, counsel "instead opened the door for evidence suggesting and implying the exact opposite" – that Wright had concealed his phone from the police and had deleted pornography before it was seized.

{¶ 196} We conclude that ineffective assistance of counsel is not demonstrated in defense counsel's cross-examination of Cooper. Given that K.W. testified that Wright had shown her pornography on his phone on December 8, 2019, it was reasonable trial strategy to ask Cooper on cross-examination if he had found pornography on the phone after he seized it. We cannot conclude that Cooper's testimony that he had obtained the

phone on December 12, 2019, necessarily suggested that Wright had acted to conceal the phone from law enforcement. There was no evidence regarding the nature of the deleted videos, and we cannot conclude that Wright was prejudiced by defense counsel's cross- and re-cross-examination of Cooper regarding the phone.

{¶ 197} For the foregoing reasons, Wright's seventh assignment of error is overruled.

{¶ 198} We will consider Wright's remaining three assignments of error together. They are:

THE TRIAL COURT ERRED AND THEREBY DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION BY OVERRULING APPELLANT'S RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL, AS THE STATE FAILED TO OFFER SUFFICIENT EVIDENCE TO PROVE EACH AND EVERY ELEMENT OF THE CHARGES BEYOND A REASONABLE DOUBT.

APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS OF LAW, AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION,

UNDER THE DOCTRINE OF ACCUMULATED ERROR, EACH OF

THE EVIDENTIARY ERRORS, ALONG WITH THE INEFFECTIVE ASSISTANCE OF APPELLANT'S TRIAL COUNSEL, WARRANT REVERSAL.

**{¶ 199}** In his eighth assignment of error, Wright asserts that as to Counts 1 and 2 in the indictment, K.W.'s testimony regarding alleged conduct during broad timeframes was "vague and non-specific." She testified that the alleged abuse happened at two different residences, "but it was not clear what happened and when." Wright asserts that there may have been sufficient evidence to establish acts in one of the timeframes, but not both. Regarding Count III, the December 8, 2019 incident, he argues that the evidence was insufficient, because although K.W. provided more details, she had "no physical findings" 24 hours later, and Mother did not see or hear anything. On all three counts, Wright asserts that there was insufficient evidence to establish the elements of the offenses, including venue and penetration.

**{¶ 200}** With respect to Count 1, the State responds that K.W. testified to how old she was when the inappropriate touching began, where it occurred in the home in which her family lived at the time, what the touching consisted of, and how it progressed over time. According to the State, K.W.'s testimony was "very clear, specific, and non-vague" with respect to, among other things, time frame, location (including the specific room), the conduct that occurred, and the fact that Wright was the perpetrator. With respect to Count II, the State also argues that K.W.'s testimony was "compelling and definitive" because she testified to the time frame, the location, who was home at the time, and the conduct. The State counters Wright's argument that there was insufficient evidence as

to Count III – because there were no physical findings during K.W.'s vaginal exam – by pointing out that both Dr. Liker and the defense's expert, Dr. Holland, testified that a normal exam is not indicative of the absence of sexual abuse.

{¶ 201} In his ninth assignment of error, Wright asserts that K.W. "alleged repeated acts of digital and penile penetration every other weekend for at least two years," but there were no physical findings to support penetration and no eyewitnesses, and K.W.'s descriptions were mostly "vague, ambiguous, and generalized." Wright notes that K.W.'s three siblings, pets, and mother did not "detect" Wright entering her room every other weekend, that K.W. did not mention the abuse in her diary, and that she did not disclose the abuse to close friends, coaches, or teachers for some time. Wright also points out that, although K.W. alleged that Wright had rubbed his penis on her crotch while on top of her, "the only 'touch' DNA was found on the waistband (not the crotch)." Wright repeats his assertion that the State did not do a DNA test Wright's son, "even though their own expert suggested they do so," and that the State offered no evidence of semen or saliva despite repeated incidents of alleged penetrative sexual intercourse prior to December 8, 2019. Wright asserts that the case was premised on K.W.'s credibility, yet her allegations did not match the physical evidence or her mother's testimony. Finally, Wright asserts that the "verdicts reflect the natural, emotional response" to the allegations but were against the manifest weight of the evidence.

{¶ 202} The State responds that Dr. Miceli testified that failing to report abuse is completely normal, and she gave a litany of reasons why children do not report in a timely fashion. K.W. testified that she did not tell someone sooner because she was scared,

particularly in light of Wright's role in law enforcement. Regarding the State's failure to test Wright's son, the State asserts that the child did not have access to the underwear, which was located by Lieutenant Moore two days after the incident in K.W.'s hamper, underneath approximately two days of dirty laundry.

{¶ 203} In his tenth assignment of error, Wright asserts that the errors at trial "served a singular purpose – to bolster and corroborate [K.W.'s] credibility," and that even if the errors were insufficient individually to warrant reversal, their cumulative impact compels reversal. He relies on *State v. Zimmerman*, 10th Dist. Franklin No. 18AP-75, 2019-Ohio-721.

{¶ 204} The State responds that "*Zimmerman* is completely inapplicable to the instant case in all respects" and that the DNA evidence was "powerful" with respect to Count III. Moreover, the State contends that K.W.'s testimony and credibility were not improperly bolstered or corroborated and that her testimony was "specific, extremely credible, and non-vague in all respects."

{¶ 205} As this Court has noted:

* * * "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins,* 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). In such situations, we apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states that:

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

(Citation omitted.) *Id.* at paragraph two of the syllabus.

In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. In this situation, a " 'court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, * * * quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *Accord State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 193.

"The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61 [and 2013-CA-62], 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

"Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Winbush*, 2017-Ohio-696, 85 N.E.3d 501 (2d Dist.), ¶ 58; *State v. Putman-Albright*, 2d Dist. Montgomery Nos. 26679, 2016-Ohio-319, ¶ 19. As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

Another important point is that "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard

the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

"Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." *Id.* "Consequently, we defer more to decisions on what testimony should be credited, than we do to decisions on the logical force to be assigned to inferences suggested by evidence, no matter how persuasive the evidence may be." *State v. Brooks*, 2d Dist. Montgomery No. 21531, 2007-Ohio-1029, ¶ 28, citing *Lawson* at *4.

*State v. Brock*, 2019-Ohio-3116, 140 N.E.3d 1239, ¶ 16-20 (2d Dist.)

{¶ 206} As noted by the Tenth District in *Zimmerman,* 10th Dist. Franklin No. 18AP-75, 2019-Ohio-721:

* * *  "Pursuant to the doctrine of cumulative error, a judgment may be reversed where the cumulative effect of errors deprives a defendant of his constitutional rights, even though the errors individually do not rise to the level of prejudicial error." *State v. McClurkin*, 10th Dist. No. 11AP-944, 2013-Ohio-1140, ¶ 61, citing *State v. Johnson*, 10th Dist. No. 10AP-137, 2010-Ohio-5440, ¶ 34; *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995).

*Id*. at ¶ 34.

{¶ 207} R.C. 2907.02 proscribes rape as follows: "(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when any of the following applies: * * * (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person."

{¶ 208} Having thoroughly reviewed the entire record, we cannot conclude that Wright's convictions were not supported by sufficient evidence or that they were against the manifest weight of the evidence. Regarding Count III, K.W. first testified about the final incident of abuse on December 8, 2019, when she had been living on North Miami Street in West Milton for about a year. She testified that A.W. had slept in her room initially for two months before she moved upstairs, leaving K.W. alone in her room. K.W. testified that Wright entered her room, got in her bed with pornography playing on his phone, and abused her as reflected in her testimony set forth above. She described his and her clothing, and Barger testified regarding Wright's touch DNA found on K.W.'s underwear. K.W. described Wright "moving back and forth on top of me" for five minutes. Barger stated that the amount of touch DNA she found was significant to her, and that she would expect "a little more vigorous contact to leave that amount of DNA behind."

{¶ 209} Regarding Count I, K.W. testified that the abuse began on North Pearl Street in Covington. K.W. testified that Wright began abusing her in the fifth grade, during the 2017-2018 school year, when she was ten years old, shortly after she had "the talk" at school and brought material home from school about puberty. She stated that Wright began touching her in the living room of their home under a blanket, and that the abuse progressed to "touching underneath my clothes," to "him putting his fingers inside"

of her at the same place. K.W. specifically testified that Wright put his penis in her mouth at the end of fifth grade in the summer, in the bedroom, while she was lying beside him. She stated that the abuse at that time was different in that Wright then "put his mouth on my private part."

{¶ 210} Regarding Count II, K.W. testified that when she was 11 years old and in the sixth grade, during the 2018-2019 school year, in Wright's bedroom, while her siblings were home, Wright ejaculated on her back for the first time after they had engaged in oral sex. K.W.'s delayed disclosure and the manner in which she remembered specific instances of abuse based upon the first time they occurred were consistent with Miceli's general testimony about the nature of child sex abuse.

{¶ 211} The jury clearly credited K.W.'s testimony, and we defer to its assessment of credibility. After viewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of the rapes proven beyond a reasonable doubt. We cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. As such, Wright's eighth and ninth assignments of error are overruled.

{¶ 212} Finally, since we find no merit in Wright's first nine assignments of error, we further conclude that cumulative error is not demonstrated, and Wright's tenth assignment of error is overruled.

{¶ 213} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and LEWIS, J., concur.


Copies sent to:

Anthony E. Kendell
Stephen E. Palmer
Hon. Stacy M. Wall